UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHELLE M. KRUL,

                    Plaintiff,

              -v-                    6:20-CV-198

LOUIS DEJOY, Postmaster General,
United States Postal Service,

                 Defendant.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                    OF COUNSEL:

BOSMAN LAW FIRM, LLC       AJ BOSMAN, ESQ.
Attorneys for Plaintiff           ROBERT J. STRUM, ESQ.
3000 McConnellsville Road
Blossvale, NY 13308

HON. CARLA B. FREEDMAN   KAREN FOLSTER
United States Attorney for the      LESPERANCE, ESQ.
   Northern District of New York  Ass't United States Attorney
Attorneys for Defendant
445 Broadway, Room 218
Albany, NY 12207

HON. CARLA B. FREEDMAN   EMER M. STACK, ESQ.
United States Attorney for the     Ass't United States Attorney
   Northern District of New York
Attorneys for Defendant
100 South Clinton Street, Room 900
Syracuse, NY 13261

---

[1] Plaintiff initially named former U.S. Postmaster General Megan J. Brennan.  The Clerk of the Court was directed to amend the caption to substitute the current officeholder.  FED. R. CIV. P. 25(d).

DAVID N. HURD
United States District Judge

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................. 4

II.   BACKGROUND .............................................................. 6

    A.  USPS Hires & Promotes Plaintiff ...............................8

    B.  Kelley Becomes Plaintiff's Supervisor ...........................9

        1.  Kelley's Request for Justification ...........................10

        2.  Simmons's Appointment....................................11

        3.  Request to Shadow in Finance...............................13

        4.  Request to Shadow in HR...................................14

        5.  2015 POOM Realignment...................................15

        6.  Relocation to Fort Plain....................................17

        7.  Unfair Project Deadlines ...................................18

        8.  Comments During Staff Meetings ...........................19

        9.  Return to Utica Area ......................................20

        10.  Employee Recognition ....................................22

        11.  First EEO Contact .......................................23

        12.  First EEO Complaint......................................25

        13.  HR Mistakes............................................26

            a.  Hancock Postmaster Selection ..........................26

            b.  Unadilla Postmaster Selection...........................27

            c.  Premature Training Schedule ...........................27

            d.  Unqualified Postmaster..................................28

        14.  Professional Development & Delays....................... 28

        15.  2017 POOM Realignment...................................29

        16.  Second EEO Contact......................................30

        17.  Second EEO Complaint ...................................30

**III.   LEGAL STANDARD** ............................................................. **32**

**IV.   DISCUSSION** ...................................................................... **33**

    A.  Preliminary Considerations.......................................... 33

       1. Plaintiff's Responsive Statement ............................. 38

       2. Plaintiff's Affirmation.................................................. 44

       3. Plaintiff's Additional Facts......................................... 48

    B.  The Merits ......................................................................... 49

       1. Count One – Sex Discrimination ............................. 50

         a. Disparate Treatment ........................................... 50

           i. Timeliness & Exhaustion ............................... 53

           ii. Materiality & Adverse Action ......................... 59

           iii. Minimal Inference of Discrimination ............................ 70

           iv. Legitimate Reasons ....................................... 74

           v. Pretext ............................................................. 76

         b. Hostile Work Environment ................................. 81

         c. Constructive Discharge....................................... 92

       2. Count Two – Retaliation............................................. 95

         a. Exhaustion & Protected Activity ....................... 98

         b. Adverse Action ................................................. 101

         c. Legitimate Reasons & Pretext ........................ 105

**V.  CONCLUSION** ...................................................................... **107**

## DECISION and ORDER

## I. INTRODUCTION

On February 24, 2020, plaintiff Michelle M. Krul ("Krul" or "plaintiff"), a retired United States Postal Service ("USPS" or "Postal Service") managerial employee, filed this civil rights action against the U.S. Postmaster General (the "Postmaster General" or "defendant"), USPS Albany District Manager Thomas Kelley, USPS Albany District Human Resources Manager Lisa Lynch, and some John and Jane Does (the "Does").  Dkt. No. 1.

Plaintiff's complaint alleged claims for employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") as well as Constitutional claims under the First and Fourteenth Amendments.  Dkt. No. 1.  Plaintiff later filed a first amended complaint (as of right) that added supporting factual detail but left her legal theories unchanged.  Dkt. No. 6.

On August 21, 2020, the Postmaster General and the named individual defendants moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the first amended complaint in its entirety.  Dkt. No. 18.  There, defendants argued that plaintiff's Title VII claims failed to plausibly allege any causal relationship between the various instances of mistreatment that plaintiff identified and her membership in a protected class; *i.e.*, her sex or gender.  *Id.*  In addition, defendants argued that plaintiff's Constitutional claims were barred by *Brown v. General Services Administration*, 425 U.S.

- 4 -

820 (1976), a case in which the Supreme Court held that Title VII provides

the exclusive civil remedy for employment- or workplace-discrimination

claims brought by covered federal employees. *Id.*

On October 9, 2020, plaintiff opposed defendants' motion to dismiss and

cross-moved for leave to file a *second* amended complaint. Dkt. No. 22. In

her proposed second amended pleading, plaintiff reasserted the same Title

VII claims for employment discrimination and retaliation. *Id.* But plaintiff's

proposed pleading withdrew her original Constitutional claims and replaced

them with a claim under the Fifth Amendment. *Id.* In plaintiff's view, the

individual defendants could still be held Constitutionally liable (despite the

Supreme Court's contrary decision in *Brown*) under the implied cause of

action recognized by the Supreme Court in *Bivens v. Six Unknown Named*

*Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Id.*

On November 17, 2020, shortly after hearing oral argument, the Court

accepted plaintiff's second amended complaint for filing and then granted in

part and denied in part defendants' motion to dismiss. *Krul v. Brennan*, 501

F. Supp. 3d 87 (N.D.N.Y. 2020). *Krul* dismissed plaintiff's Fifth Amendment

*Bivens* claim because she was a federal employee covered by Title VII, which,

consistent with the Supreme Court's decision in *Brown*, provided her with an

exclusive civil remedy. *Id.* at 102. *Krul* then dismissed those Title VII claims

against Kelley, Lynch, and the Does because the *only* proper defendant in a

Title VII action brought by a covered federal employee is the head of the federal agency itself—here, the Postmaster General.  *Id.*

As to this sole remaining defendant, *Krul* concluded that plaintiff's second amended complaint plausibly alleged Title VII sex discrimination claims (in Count One) under three distinct-but-related theories: (a) disparate treatment; (b) a hostile work environment; and (c) constructive discharge.  501 F. Supp. 3d at 96–99.  *Krul* further concluded that the second amended complaint had plausibly alleged a Title VII retaliation claim (in Count Two).  *Id.* at 99–100.

On March 17, 2023, after the close of discovery, defendant moved under Rule 56 of the Federal Rules of Civil Procedure for summary judgment on the remaining claims.  Dkt. No. 93.  The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II.  <u>BACKGROUND</u>

The factual narrative in this section has been developed from a careful review of plaintiff's response to defendant's statement of material facts, Dkt. No. 103-58, plaintiff's affirmation in opposition to defendant's motion for summary judgment, Dkt. No. 103-57, plaintiff's deposition testimony, Dkt. No. 103-1, and a few other materials identified by the parties in their filings.

Notably, however, despite extensive discovery into plaintiff's employment relationship with the U.S. Postal Service, her own responses in opposition to summary judgment have left a number of things unclear.  For instance, the

Court cannot even say for certain what year plaintiff was hired. Plaintiff "admits" that it was 1984, Dkt. No. 103-58 ¶ 1, but in her affirmation (which was presumably made on her own personal knowledge), plaintiff avers that it was 1983 instead, Dkt. No. 103-57 ¶ 2.

To be sure, this particular fact is not really all that "material" for purposes of summary judgment. But this kind of inexcusable confusion about such a basic event in the chronology foreshadows the analytical difficulty presented by plaintiffs' filings. Those difficulties—and what, if anything, can be done about them to clarify the analysis for purposes of summary judgment—will be discussed *infra*, particularly in part IV.A.

Where disputes about (or frequently, where "denials" by plaintiff that are grounded in a contested characterization of) a particular fact arise, the Court has taken two different approaches. First, in spots where more information might sharpen the analysis by framing a disputed event in its proper context, the Court has identified the nature of the dispute and set forth the parties' respective positions on that issue. This approach also serves as a vehicle to introduce certain evidence offered by defendant to satisfy his step-two burden under the *McDonnell Douglas* frameworks, discussed *infra*. Second, although perhaps less frequently, in situations where an understanding of the parties' exact dispute proves unnecessary or irrelevant, the Court has just recited plaintiff's version of the event in question (since she is the non-movant here).

A.  **USPS Hires & Promotes Plaintiff**

In 1983 or 1984, USPS hired Krul, who is female, to work in the Northeast Area, a large administrative region which includes a smaller one called the Albany District.  Krul Aff., Dkt. No. 103-57 ¶ 2 (1983); Pl.'s Resp. to Def.'s Facts ("Pl.'s Resp."), Dkt. No. 103-58 ¶¶ 1–2 (1984).  The Albany District is a fairly large piece of territory in its own right: it "spans, east to west, from the Vermont border to the Waterloo area and, north to south, from the Canadian border to the Massachusetts and Pennsylvania borders."  Krul Aff. ¶ 2.

Postal Service operations within the Albany District are subdivided into even smaller geographic "areas" or "territories."  Pl.'s Resp. ¶ 4.  Each one of these areas or territories is supervised by a Post Office Operations Manager ("POOM" or "Operations Manager").  *Id.*  A POOM "is a higher-level manager in a postal district who oversees the operations of postmasters and all post offices and facilities in a designated geographic area."  *Id.*

In 2009, USPS promoted plaintiff to the title of POOM.  Krul Aff. ¶ 3.  She covered part of the Albany District and worked out of an office in Utica, New York, which was near her home.  Krul Dep., Dkt. No. 103-1 at 28:8.[2]  Plaintiff "consistently received positive employee evaluations since being hired" and

---

[2] Pagination for the deposition matches the document's internal pagination rather than ECF.

also "received positive feedback about [her] performance from all of [her] superiors."  Krul Aff. ¶ 4.  But the status quo changed in late 2014.

## B.  Kelley Becomes Plaintiff's Supervisor

On October 28, 2014, USPS elevated Thomas Kelley to the title of Acting Manager for the Albany District.  Krul Aff. ¶ 5; Pl.'s Resp. ¶ 7.  Kelley was later made the District Manager on a permanent basis.  Pl.'s Resp. ¶ 7.  As Albany District Manager, Kelley "was responsible for overseeing the entire operations of the district, including mail processing, post offices, delivery, human resources, marketing, and finance."  *Id*. ¶ 6.  Kelley also supervised about sixteen direct-reports, including plaintiff and the other POOMs who worked in the Albany District.  *See* Krul Aff. ¶ 6; Pl.'s Resp. ¶ 5.

During the time period relevant here, Kelley supervised a total of five other POOMs in addition to plaintiff: Jeffrey Sands; David Clark (from 2014 through May 2016); Anthony Hall (from July 2016 onward); Maureen Hohl; and Mary Madonna.  Pl.'s Resp. ¶¶ 14–18.  For purposes of comparison, the parties agree that Sands, Clark, and Hall are male, while Hohl and Madonna are female.  *See generally* Pl.'s Resp.  According to plaintiff, Kelley generally treated plaintiff "worse" than these male colleagues:

> Kelley communicated with them in a professional way and treated them with respect.  Kelley also was consistently pleasant with males; for example, wishing them happy birthday or a good vacation.  In contrast, he was cold towards me and, at times, acted with

> hostility and anger.  On occasions too numerous to mention, he abruptly ended conversations or walked away from me in the midst of a conversation.  He also mimicked, mocked, taunted, and laughed at me.

Krul Aff. ¶ 6; *see also* Pl.'s Add'l Facts ("Pl.'s Facts"), Dkt. No. 103-59 ¶ 192.[3]

Kelley also supervised Lisa Lynch, the Human Resources ("HR") Manager for the Albany District.  Pl.'s Resp. ¶¶ 9, 12–13.  HR Manager Lynch had no authority to hire or fire POOMs, to promote or demote plaintiff, or to rate or review plaintiff for performance evaluation purposes.  *Id*. ¶ 11.  Because both women reported directly to Kelley, plaintiff admits that she and Lynch were considered "peers."  *Id*. ¶ 12.

### 1.  Kelley's Request for Justification

In November of 2014, shortly after Kelley was installed as Acting District Manager, plaintiff "made a routine request" to fill one of the postmaster jobs within her POOM area.  Krul Aff. ¶ 20.  As plaintiff explains, "POOMs have the discretion to select, in their judgment, the best candidate for vacancies in their POOM area."  *Id*.; Pl.'s Facts ¶ 198.  Kelley responded to this "routine request" by asking plaintiff for "more information" about the other applicants she had considered (but not selected) for this job.  Krul Aff. ¶ 20.  Plaintiff

---

[3] Plaintiff's "Statement of Additional Material Facts" mostly just rehashes the averments she has made in her affirmation, a document which has already been considered (and cited extensively) in this fact pattern.  Even so, certain additional assertions made in this statement of additional material facts (that were not found elsewhere) have been included in this fact section.  In his reply, defendant argues that this document is improper and should not be considered.  That argument will be discussed *infra* in IV.A.

"had been making [p]ostmaster selection requests since 2009 and never before had such justification information been sought from [her]."  *Id.*

An HR employee named Peggy Brennan characterized Kelley's request for more information as "unusual," *id.*, because HR does not require "a selecting official" (like plaintiff) to "submit any justification for that selection."  Pl.'s Facts ¶ 198.  Plaintiff later learned that Kelley had not required "the same justification or breadth of information" about vacancies from Brian Murley, a then-Acting POOM who was male.  Krul Aff. ¶ 21.

### 2. <u>Simmons's Appointment</u>

In December of 2014, Kelley placed HR Specialist Mary Simmons into the postmaster job at the Jamesville, New York post office.  Pl.'s Resp. ¶ 19; Krul Aff. ¶ 22.  But this personnel change was "on paper only"; *i.e.*, Ms. Simmons continued working as an HR employee in another office despite the nominal change in her job title and its location.  Pl.'s Resp. ¶¶ 20, 25; Krul Aff. ¶ 22.

The parties agree that Simmons's job as an HR employee was some kind of time-limited position that was being terminated or otherwise ending.  Krul Aff. ¶ 22; Pl.'s Resp. ¶ 21; *see* Pl.'s Facts ¶ 200.  Defendant claims that Kelley moved Simmons into the Jamesville postmaster job to keep her employed by USPS.  Pl.'s Resp. ¶ 22.  Plaintiff acknowledges that moving Simmons into the Jamesville job kept her employed, Pl.'s Facts ¶ 200, but insists there were other suitable vacancies available elsewhere, *see id.* ¶ 205.

Why does this matter?  The Jamesville post office was in plaintiff's POOM territory or area.  Krul Aff. ¶ 22; Pl.'s Resp. ¶ 23.  As plaintiff explains, she objected to Simmons's placement in the Jamesville postmaster role because she believed the "Jamesville office was in strong need of stable management" at that time.  Krul Aff. ¶ 22.  When plaintiff "relayed these concerns to Kelley during a phone call," he "dismissed" them.  *Id*.  And when plaintiff requested "an e-mail from him directing [her] to appoint" Simmons as the Jamesville postmaster, Kelley "slammed the phone" down and hung up.  *Id*.

Defendant contends that Kelley, as Albany District Manager, possessed the authority to make this kind of personnel decision.  Pl.'s Resp. ¶ 24.  But plaintiff claims that Kelley was "not responsible for hiring or promoting for positions other than his direct reports."  *See id*.  Plaintiff says that Simmons's placement as Jamesville postmaster "substantially hampered, compromised, and undermined" her authority.  Krul Aff. ¶ 23.  It also made plaintiff's "job more difficult as it required [her] increased presence in the office to supervise and monitor operations."  *Id*. ¶ 24; *see also* Pl.'s Facts ¶ 203.

Because Simmons continued working in her HR role rather than actually taking over as Jamesville postmaster, Joy Hotaling was eventually selected to serve as the Officer-in-Charge ("OIC"), or the acting postmaster, at the Jamesville post office.  Pl.'s Resp. ¶¶ 25–26.  Defendant claims that plaintiff chose Hotaling for this job.  *Id*.  But plaintiff denies this, claims that Kelley

left the position vacant for four months, says that Kelley eventually made the decision to hire Hotaling without plaintiff's input, and asserts that Hotaling ultimately failed to perform the job in a competent manner.  Krul Aff. ¶ 25. Plaintiff "know[s] of no situation where a male POOM was forced to place a [p]ostmaster into their territory against their judgment and in contravention to [*sic*] their authority and wishes."  *Id*. ¶ 26; Pl.'s Resp. ¶¶ 27–28.

### 3.  Request to Shadow in Finance

In October of 2014, plaintiff "requested an opportunity to shadow Tony Maio in his position as Manager of Finance."  Krul Aff. ¶ 12.[4]  As plaintiff explains, she was a participant in a USPS executive leadership program that encouraged temporary placements into other departments.  *Id*.  But this kind of request to "shadow" or "detail" in another department required approval from the employee's manager—in this case, Kelley.  Pl.'s Facts ¶ 196.  Kelley told plaintiff that he would consider her request to shadow Mr. Maio, but he never acted on plaintiff's request.  Krul Aff. ¶ 12; Pl.'s Resp. ¶ 36.

Instead, on March 31, 2015, Tony Maio retired from his role as Manager of Finance.  Krul Aff. ¶ 13.  Kelley bore responsibility for "detailing" someone else into that job title until a permanent replacement could be selected.  Pl.'s

---

[4]  Plaintiff had also made this request to the previous District Manager in 2013 or 2014, but was instructed to wait until a permanent District Manager was appointed.  Krul Aff. ¶ 11; *see also* Pl.'s Facts ¶ 195.

Resp. ¶ 37.  Plaintiff requested this temporary detail, but Kelley appointed a man named Frank Raso instead.  Krul Aff. ¶ 13; Pl.'s Resp. ¶¶ 38, 40–41.

About a month later, District Manager Kelley interviewed plaintiff and three other applicants for the permanent Manager of Finance job.  Pl.'s Resp. 47–49.  Kelley selected a man named Stephen Sheffer.  *Id.* ¶ 50.  Defendant claims Sheffer was the most qualified applicant, *id.* ¶¶ 51–54, but plaintiff contends that Sheffer was only more qualified than her because Kelley kept denying plaintiff the relevant training opportunities, *id.*

### 4.  **Request to Shadow in HR**

At or around the same time that she requested to be work in the Finance Department, plaintiff also made a verbal request to District Manager Kelley to "shadow" or "detail" HR Manager Lynch.  Krul Aff. ¶ 18; Pl.'s Resp. ¶ 29; Krul Dep. at 58:25–59:6.  In response to plaintiff's request, Kelley instructed plaintiff to talk to Lynch directly.  Krul Dep. at 59:13–17.

Plaintiff did so immediately.  Krul Dep. at 59:13–17.  But although HR Manager Lynch told plaintiff that "she would consider it," this opportunity never materialized, either.  *Id.* at 59:18–22; Pl.'s Resp. ¶ 33.  Plaintiff does not know of any other POOM that was permitted to shadow HR Manager Lynch.  Krul Dep. at 59:22–25; Pl.'s Resp. ¶ 35.

5. **2015 POOM Realignment**

Until mid-2015, the Albany District was divided between plaintiff and five other POOMs: Jeff Sands, David Clark, Mary Madonna, Maureen Hohl, and another woman who has not previously been mentioned: Gail Weeks. Krul Aff. ¶ 7. When Kelley took over the Albany District in late 2014, Weeks held a Grade 25 position while plaintiff and the other four POOMs held Grade 22 positions. *Id*. Later, when Weeks retired, Kelley appointed Mary Madonna, another woman, to the Grade 25 POOM title. *Id*. ¶ 8. But plaintiff says she was the "most senior" of the Grade 22 POOMs at this time. Pl.'s Facts ¶ 193.

In June of 2015, USPS implemented a nationwide realignment of POOM operations. Pl.'s Resp. ¶ 58. As a result of this top-down directive, the total number of POOM positions in the Albany District was reduced from eight to five. *Id*. ¶ 59. District Manager Kelley and another USPS specialist mapped out new POOM territories for the Albany District to distribute the workload amongst the smaller number of POOMs. *Id*. ¶¶ 60–62.

As a result of this realignment, each POOM in the Albany District wound up with a greater overall workload; *i.e.*, they became responsible for more total post offices. Pl.'s Resp. ¶¶ 67–72. But plaintiff claims that Kelley treated plaintiff's male colleagues better. Krul Aff. ¶¶ 29–34. Plaintiff identifies three particular complaints. First, even though plaintiff was the most "senior" of the remaining Grade 22 POOMs, she was reassigned to a

territory "near Albany," which was far away from her home in Utica.  Pl.'s Resp. ¶ 73–75;  Krul Dep. at 83:18–20.  That will be discussed in a moment.

Second, plaintiff contends that the "highest-performing offices that [she] had developed in the Utica area were exchanged for low- or lower-performing offices elsewhere.  Krul Aff. ¶ 29.  According to plaintiff, "POOMs' pay is directly tied to the performance of the [p]ost offices that they supervise." *Id.*[5]

Third, plaintiff claims that she was "initially assigned a greater number of total offices than the male POOMs."  Krul Aff. ¶ 30.  Plaintiff complained to Kelley and others about this workload disparity.  *Id.* ¶ 31.  Thereafter, before the new territory maps became final, the map was readjusted, and all the "level 21" offices were reassigned "to higher-level female POOMs."  *Id.* ¶ 33.

Plaintiff contends that the reassignment of these "level 21" offices to other female POOMs deprived her of an opportunity to gain important experience, because level 21 offices require a greater level of supervision.  Krul Aff. ¶ 34.  According to plaintiff, this later resulted in a woman named Maureen Hohl being promoted instead of her.  *Id.*; Pl.'s Facts ¶ 214.

At some point in 2015, Kelley awarded Clark, a male POOM, a one-time "SPOT cash award [for] driving 'work hour performance.'"  Pl.'s Facts ¶ 247.

---

[5]  Notably, however, plaintiff's affirmation does not aver that she received less pay or a smaller bonus as a result of this change.  Those facts would certainly be within her knowledge.  Although she cites as an exhibit a USPS "report card" that tracks certain performance indicators, the document does not show that she ever received less pay, either.  Ex. 20 to Krul Aff., Dkt. No. 103-20.

Kelley did not give plaintiff a SPOT cash award that year even though "she lowered work hours more than Clark during 2015." *Id.*

### 6. Relocation to Fort Plain

Prior to the realignment, plaintiff's POOM territory was "centrally located within the Albany District," plaintiff's office was located inside the Utica post office, and plaintiff lived near Utica. Pl.'s Resp. ¶¶ 64, 73. But after the 2015 realignment, plaintiff was reassigned to a new territory "near Albany," which was far away from her home in Utica. *Id.* ¶ 73–75. As part of this change, Kelley forced plaintiff to move her office into a building in Fort Plain, which was "an hour and twenty minutes from [her] home." Krul Aff. ¶¶ 35, 37.

Defendant claims that District Manager Kelley selected the Fort Plain location because it was situated within the new POOM area that had been assigned to plaintiff. Pl.'s Resp. ¶ 75. But plaintiff claims that there is no such "residency" requirement. *See, e.g.*, Pl.'s Resp. ¶¶ 76, 78. According to plaintiff, the male POOMs were permitted to remain in offices outside of their new POOM areas. Krul Aff. ¶ 35; *see also* Pl.'s Facts ¶ 221.

Plaintiff proposed several alternative offices in locations that were closer to her home near Utica. Krul Aff. ¶ 38. For instance, plaintiff proposed an office space that USPS owned in Little Falls, which was within her revised POOM territory. *Id.* ¶ 37. According to plaintiff, Kelley even acknowledged that he could have "moved one office, such as Remsen, from one POOM area

to another for [p]laintiff to use." Pl.'s Facts ¶ 223. But Kelley denied all of these requests. Krul Aff. ¶¶ 37–40. The only alternative that Kelley offered plaintiff was a "downgrade" to an office in Rome. Pl.'s Facts ¶ 219. According to plaintiff, a "downgrade" is considered "career suicide." *Id*. ¶ 220.

In any event, the parties agree that no other POOM (male or female) was required to move as a result of the realignment. Pl.'s Resp. ¶ 82. The parties also agree that the Fort Plain office "was in need of repairs" when plaintiff was assigned to that location. Pl.'s Resp. ¶ 79. But plaintiff claims that the Fort Plain office space was unsafe: it "had no water, no heat, no phones, and no parking." Krul Aff. ¶ 41. Although repair work was completed on this office space, plaintiff claims that the repairs were incomplete—"there were no workable bathrooms" and "the heat did not work." Pl.'s Resp. ¶¶ 80–81; Krul Aff. ¶ 43.

**7. <u>Unfair Project Deadlines</u>**

On February 9, 2016, plaintiff and District Manager Kelley attended a "telecom" conference to discuss project deadlines for Lean Six Sigma ("LSS"), a workplace efficiency certification program that was being rolled out across the Postal Service. Krul Aff. ¶ 44; Pl.'s Resp. ¶ 55. According to plaintiff, at this meeting Kelley "committed" plaintiff and another woman named Carol Capone to a more aggressive set of deadlines than those expected of her male peers. Krul Aff. ¶ 44; Pl.'s Resp. ¶ 56. In addition, plaintiff contends she was

denied "refresher" training about this program even though "all of the other POOMs" were given this refresher training as a group.  Krul Aff. ¶ 44.

### 8.  **Comments During Staff Meetings**

On March 25, 2016, plaintiff attended a "staff telephone conference."  Krul Aff. ¶ 45.  There, Kelley "announced" that a POOM named Jeffrey Sands had experienced a "zero bundle," which is USPS jargon for what happens "when mail is left behind."  *Id*.  According to plaintiff, a "zero bundle" is "regarded as a significant service failure."  *Id*.  But instead of criticizing Sands for the failure in his own POOM territory, District Manager Kelley "began yelling at [plaintiff]" and "attempted to blame [her]."  *Id*.

During this staff teleconference, Kelley also "brought up a disciplinary action" that plaintiff had initiated against one of her supervisee-postmasters "for failure to report mail left in a building."  Krul Aff. ¶ 45.  According to plaintiff, Kelley stated that the "zero bundle" service failures experienced in Jeffrey Sands' territory would not have occurred if plaintiff had not issued discipline against her own postmaster.  *Id*.  As plaintiff explains, "according to [Kelley], employees were now hesitant to report a service failure."  *Id*.

Defendant acknowledges that District Manager Kelley discussed this disciplinary situation during the staff teleconference.  Pl.'s Resp. ¶ 87.  But according to defendant, the purpose of this discussion was to educate the

entire management group on updated protocols. *Id.* ¶¶ 87–88.  Kelley did not identify plaintiff by name or even mention the post office involved. *Id.* ¶ 89.

Plaintiff concedes that Kelley did not mention her by name during this discussion about discipline. Pl.'s Resp. ¶ 89. But plaintiff insists that Kelley did not need to do so because it was already "common knowledge among the attendees." *Id.* In plaintiff's view, Kelley's comments about her disciplinary decisions "were totally unwarranted." Krul Aff. ¶ 46. What's more, plaintiff says, is that she had "never witnessed" Kelley "yelling at male employees or treating them in such a disrespectful way." *Id.*

On May 11, 2016, plaintiff attended another, much larger staff meeting with approximately 100 to 200 attendees. Pl.'s Resp. ¶ 84; Krul Aff. ¶ 47. At this meeting, Kelley again "publicly embarrassed and undermined" plaintiff by discussing the disciplinary incident "in a way that suggested the discipline was unwarranted." Krul Aff. ¶ 47. As before, all the attendees already knew that Kelley's comments were about plaintiff because the disciplinary incident was common knowledge amongst the staff. *Id.*; Pl.'s Facts ¶ 234.

### 9. **Return to Utica Area**

In April of 2016, District Manager Kelley offered plaintiff the opportunity to relocate to the "South POOM Territory." Pl.'s Resp. ¶ 91. By taking over this POOM territory, plaintiff was able to relocate her office back to the Utica area. *See id.* But plaintiff complains that she was only offered this job after

a lower-level male employee named Timothy Gwardyak turned it down.  Krul Aff. ¶ 48.  In addition, plaintiff claims that Kelley "demanded an immediate response" to this job offer.  Pl.'s Resp. ¶¶ 94–95.  According to plaintiff, she was not aware of any other employee that had ever been given this kind of an "exploding" job offer.  *Id*. ¶ 98.

Plaintiff also complains that Kelley "did not consult [her] as to whom he should consider" as her replacement POOM.  Krul Aff. ¶ 49.  Plaintiff would have suggested several well-qualified women to replace her, but Kelley chose a lesser-qualified man named Tony Hall instead.  *Id*.  According to plaintiff, Hall was never required to work out of the Fort Plain office, either.  *Id*. ¶ 50.

On May 14, 2016, plaintiff officially took over responsibility for the South POOM Territory.  Krul Aff. ¶ 49.  Plaintiff says Kelley "immediately added two post-offices (Apalachin and Unadilla)" to this territory, which increased plaintiff's workload.  *Id*.  Less than a month later, in June of 2016, plaintiff attended a meeting with Kelley, Lynch, and several others.  *Id*. ¶ 51.  When plaintiff brought up the "multiple issues" that she had "inherited" in the South POOM territory and questioned "how much longer" she could "continue fixing everyone else's mistakes," Kelley began to criticize plaintiff's own job performance.  *Id*.  In response, plaintiff told Kelley that she believed male employees were being treated more favorably than female ones.  *Id*.  Kelley

responded by "mock[ing]" plaintiff in the presence of two male co-workers and "using a female high-pitched whiny tone." *Id.*

**10.  <u>Employee Recognition</u>**

In the late summer of 2016, plaintiff contacted District Manager Kelley to discuss how to handle "SPOT recognition awards." Krul Aff. ¶ 52. These are cash awards that can be given out by managers to "recognize employees for high performance." *Id.* Because plaintiff had just moved back into the South POOM area, she believed that she "did not have sufficient information to enable [her] to identify which employees deserved bonuses." *Id.* In addition, plaintiff "was also concerned that the employees in [her] former territory would not be recognized appropriately." *Id.*

District Manager Kelley instructed plaintiff to contact David Clark, one of the other male POOMs, to seek his input. Krul Aff. ¶ 52. Kelley also told plaintiff to contact Tony Hall, the male POOM who had replaced plaintiff in the POOM East area. *Id.*; *see also* Pl.'s Resp. ¶¶ 101–102. Although plaintiff repeatedly tried to contact Hall, he was "non-responsive" until it was "too late." Krul Aff. ¶ 52. Plaintiff complained about Hall's conduct to Kelley, Lynch, and others. *Id.* But no one acted on these complaints. *Id.*

Plaintiff eventually used some of her $25,000 SPOT money (allocated for employees in the South POOM area) to recognize her former employees in the East POOM area. Krul Aff. ¶ 52. According to plaintiff, this decision left her

with "less money to recognize [her] new employees." *Id*. In plaintiff's view, this also damaged her reputation because it "allowed" Hall "to act as though it was acceptable to ignore [her] input." *Id*.

Around this time, District Manager Kelley also denied a SPOT award that plaintiff requested for one of her employees. Krul Aff. ¶ 53. According to plaintiff, she had never had one of her SPOT awards denied in the past and knows of no other occasion on which such an award has been denied. *Id*.

### 11. <u>First EEO Contact</u>

On September 1, 2016, plaintiff told Jeff Sands, one of the male POOMs, that she intended to file an administrative complaint of discrimination (called an Equal Employment Opportunity ("EEO") complaint) with USPS about District Manager Kelley's ongoing mistreatment. Krul Aff. ¶ 54.

On September 6, 2016, plaintiff initiated the EEO process by seeking "pre-complaint" counseling. Pl.'s Resp. ¶ 184; Krul Aff. ¶ 59. Broadly speaking, plaintiff complained to an EEO counselor that Kelley's conduct vis-à-vis each of the events discussed in subheadings II.B.1 through II.B.10 of this section were the product of sex discrimination and/or retaliation. *See* Ex. SS to Stack Decl., Dkt. No. 93-47. The news that plaintiff had begun the EEO process spread quickly amongst her colleagues. Krul Aff. ¶ 54. Kelley even reported to USPS's Inspector General ("IG") that plaintiff was not "doing her job," but the IG declined to open an investigation. Pl.'s Facts ¶ 268.

On September 20, 2016, plaintiff attended a USPS work event that was organized for the purpose of recognizing a "rural carrier" who had made an Employee Engagement Program ("EEP") sale to a company named "Death Wish Coffee." Pl.'s Resp. ¶ 104. This event occurred at the Burnt Hills Post Office, which was within the East POOM territory that was now managed by Anthony Hall. *Id.* ¶¶ 104–105.

Sonya Tutty, a postmaster formerly supervised by plaintiff, was involved in making this EEP sale to the coffee company. Pl.'s Resp. ¶¶ 105–108. And plaintiff had supported Tutty's efforts in doing so. *Id.* But neither woman was invited to the event. *Id.* In fact, neither woman even learned about the event until after it occurred. *Id.* ¶ 109. Defendant contends that this event was organized by Frank Raso, a male POOM who had no knowledge of their involvement in the sale. Pl.'s Resp. ¶¶ 110–111. But plaintiff insists that Kelley intentionally excluded her. *Id.* ¶¶ 111–113; Krul. Aff. ¶ 57.

Later that day, plaintiff attended a USPS work meeting at the Oneida NY Golf Course. Krul Aff. ¶ 55. When plaintiff arrived at the event, she spoke to Tutty, who "expressed that she was upset about not being invited to attend the [coffee] ceremony or [being] otherwise recognized for her work on the [coffee sale]." *Id.* After speaking to Tutty about the coffee event, plaintiff sat down near the back of the meeting room. *Id.* ¶ 56.

Kelley soon sat down next to plaintiff, which prompted one attendee to ask plaintiff whether Kelley was "babysitting" her.  Krul Aff. ¶ 56.  Plaintiff told Kelley that Tutty was upset about the way the coffee sale was handled, but Kelley dismissed her complaint.  *Id*.  However, Kelley did give plaintiff "a check for a SPOT award recognition."  *Id*. ¶ 58.  In plaintiff's view, Kelley only gave plaintiff this SPOT award because he had learned that plaintiff intended to file an EEO complaint against him.  *Id*.

Later, on an unspecified date in October of 2016, plaintiff requested that an unnamed postmaster under her supervision in the POOM South Area be returned from a "detail" in Albany.  Krul Aff. ¶ 60.  District Manager Kelley refused plaintiff's request.  *Id*.; Pl.'s Facts ¶ 250.

### 12.  <u>First EEO Complaint</u>

On October 13, 2016, plaintiff filed a formal EEO complaint.  Ex. UU to Stack Decl., Dkt. No. 93-47; Krul Aff. ¶ 59.  Broadly stated, plaintiff's EEO complaint accused Kelley of discriminating against her, and "possibly" even retaliating against her, for the various events set forth and discussed in the foregoing subheadings.  *See* Ex. UU to Stack Decl.

After she filed this formal EEO complaint, HR Manager Lynch began to "avoid communicating" with plaintiff, which made it more difficult for her to "carry out necessary personnel changes" and other HR matters in her POOM territory.  Krul Aff. ¶ 62.  Plaintiff's colleagues "became uneasy" around her

and began to "avoid[ ] contact" with her. *Id.* ¶ 63. For instance, plaintiff claims that HR Manager Lynch cautioned employees to "be careful" about talking with plaintiff. *Id.* On another occasion, plaintiff began walking toward an employee named Henry Dynka, who "abruptly turned and walked in a different direction." *Id.* Plaintiff also heard that other unnamed USPS employees "disparaged" plaintiff to her own supervisees. *Id.* ¶ 64.

Plaintiff continued to pursue the EEO complaint process. She submitted an affidavit to the EEO office on December 2, 2016. Krul Aff. ¶ 61. She was interviewed by investigators on January 17, 2017. *Id.* And she requested a hearing on her complaint on March 23, 2017. *Id.*

### 13. **HR Mistakes**

Plaintiff contends that her filing of this formal EEO complaint, and her pursuit of the discrimination and/or retaliation claims she raised in it, caused her to be "subjected to a series of deliberate efforts to make it appear to [her] employees that [she] was incompetent." Krul Aff. ¶ 65. She identifies four:

### a. **Hancock Postmaster Selection**

In July of 2017, plaintiff selected Don Simonik to fill a postmaster vacancy in the Hancock, New York post office. Pl.'s Resp. ¶¶ 114–120. According to plaintiff, she requested and received approval from HR to give Simonik a 10% pay raise. Krul Aff. ¶ 69. But after plaintiff notified Mr. Simonik of the good news, HR informed plaintiff that her request could not be processed. *Id.*; Pl.'s

Resp. ¶¶ 121–122.  According to plaintiff, this led to "further erosion of [her] authority and subordinates' confidence" in her competence.  Krul Aff. ¶ 69.

### b. Unadilla Postmaster Selection

Later, plaintiff selected Chad Harris to fill a postmaster vacancy in the Unadilla, New York post office.  Pl.'s Resp ¶ 126; Krul Aff. ¶ 66.  Because this job was technically a downgrade from Harris's prior job title, it required some kind of written approval from agency headquarters and management.  Pl.'s Resp. ¶¶ 127–128.  But an HR employee named Peggy Brennan failed to take these extra steps in the approval process.  This forced plaintiff to retract her announcement about Mr. Harris's new job title and to apologize to him for the error.  Krul Aff. ¶ 66.  According to defendant, the HR error was merely an oversight, and steps were taken to correct it once it was discovered.  Pl.'s Resp. ¶¶ 129–131.  Plaintiff, however, insists that HR deliberately made this error to embarrass her.  *Id*.  This "reflected negatively" on plaintiff and "was a further erosion of [her] reputation and authority."  Krul Aff. ¶ 66.

### c. Premature Training Schedule

At or around this same time period, plaintiff selected Tim Gwardyak for another postmaster position.  Pl.'s Resp. ¶ 135.  Although POOMs are given an opportunity to notify the unsuccessful candidates and to congratulate the successful one (in this case, Gwardyak), HR prematurely sent Mr. Gwardyak a training schedule before plaintiff learned that he had been approved.  Krul

Aff. ¶ 67; Pl.'s Resp. ¶¶ 133–138.  This mistake had never happened to any other POOM and "reflected negatively" on plaintiff.  Krul Aff. ¶ 67.

### d. <u>Unqualified Postmaster</u>

Around this same time period, a postmaster was appointed in plaintiff's territory while she was out on vacation.  Krul Aff. ¶ 68.  An HR employee selected the new hire based on a recommendation made by Jeff Sands, one of her fellow POOMs.  *Id*.  But Sands recommended an unqualified person.  *Id*.  This left plaintiff with "an unqualified [p]ostmaster" and "led to resentment amongst [her] employees."  *Id*.

### 14. <u>Professional Development & Delays</u>

On July 11, 2017, plaintiff and Kelley received a "group e-mail" about the creation of Individual Development Plans ("IDPs") for executive leadership program candidates.  Krul Aff ¶ 72.  This e-mail directed program candidates (like plaintiff) "to meet with their manager to discuss their IDP activity."  *Id*.  Plaintiff forwarded this e-mail to Kelley and "complained that [she] had submitted 'IDPs for years to no avail.'"  *Id*.

Kelley never responded to plaintiff's e-mail and "therefore [she] never developed a new IDP."  Krul Aff. ¶ 72.  Defendant claims the IDP program places an initial burden on the employee to identify specific opportunities and request specific assignments.  Pl.'s Resp. ¶¶ 142–143.  But plaintiff insists that more direct involvement from the supervisor is expected.  *Id*. ¶ 144.

In any event, on October 20, 2017, plaintiff received an automated e-mail indicating that her IDP activity had not been completed.  Pl.'s Resp. ¶ 145. Plaintiff forwarded this e-mail to Kelley and Lynch and again faulted Kelley for not responding to her prior request.  *Id*. ¶ 146; Krul Aff. ¶ 72.

During this same time period, plaintiff contends that certain award requests made by her male colleagues were approved by Kelley more quickly than the approvals she submitted to him.  Krul Aff. ¶ 71; Pl.'s Facts ¶ 256.

**15.  2017 POOM Realignment**

In October of 2017, plaintiff and two other Grade 22 POOMs in the Albany District—Jeff Sands and Tony Hall—were promoted to Grade 23.  Pl.'s Resp. ¶¶ 147–149.  Kelley also realigned the POOM territories.  *Id*. ¶ 150.  As part of this second realignment, plaintiff was assigned an additional post office in Cortland, New York.  Krul Aff. ¶ 73.  According to plaintiff, this extra post office "was outside the geographical boundaries of the South POOM area and had well-known personnel and safety issues."  *Id*.

Plaintiff contends that Kelley should have assigned her the Endicott post office instead, since that office was within her new territory.  Krul Aff. ¶ 73. Plaintiff also complained to Kelley that she was being treated less favorably than Hall, a fellow male POOM, because of the problems with the Cortland office.  *Id*.  But Kelley overruled plaintiff and assigned the Cortland office to her anyway.  *Id*.; Pl.'s Resp. ¶¶ 156–159.

**16. Second EEO Contact**

On October 19, 2017, plaintiff initiated the process of filing a second EEO complaint.  Ex. WW to Stack Decl., Dkt. No. 93-51.  Broadly speaking, this second complaint accused Kelley of continuing to discriminate and retaliate against plaintiff for the events that occurred since she filed her first EEO complaint.  *Id*.  In particular, plaintiff identified the second POOM territory realignment, the series of HR "mistakes," and the lack of career development opportunities or guidance in the leadership-development program.  *Id*.

On October 25, 2017, plaintiff e-mailed District Manager Kelley and HR Manager Lynch to request that she be allowed to communicate with them about work matters by e-mail rather than by telephone or in person.  Krul Aff. ¶ 76; Pl.'s Resp. ¶ 160.  Plaintiff wanted to gather more documentation that would substantiate her EEO complaint and provide that information to the investigators.  Krul Aff. ¶ 76.  But after a series of e-mail exchanges in which Kelley and Lynch both indicated that plaintiff needed to be available by telephone or other means in addition to e-mail, Kelley denied plaintiff's request to communicate *solely* by e-mail.  *Id*. ¶ 77; Pl.'s Resp. ¶¶ 162–173.

**17. Second EEO Complaint**

At or around this same time in October of 2017, plaintiff complained about all of these events to a higher-level USPS Human Resources employee named Theresa Bruso, the Northeast Area HR Manager.  Krul Aff. ¶ 74.  Plaintiff

claims that in response to this complaint to Bruso, the Albany District HR department "held up posting vacancy announcements for Postmaster positions in [plaintiff's] POOM area." *Id*. ¶ 75.

Shortly thereafter, HR Manager Bruso arranged a meeting with plaintiff, District Manager Kelley, HR Manager Lynch. *See* Krul Aff. ¶ 80. But this meeting was initially cancelled. *Id*. The meeting was rescheduled, and later occurred, after plaintiff secured the attendance of an EEO representative. *Id*.

On January 18, 2018, plaintiff filed her second EEO complaint. Ex. XX to Stack Decl., Dkt. No. 93-52. This complaint accused Kelley of discriminating and retaliating against plaintiff for the various events that had occurred since she filed her first EEO complaint. *Id*. The Postal Service eventually dismissed plaintiff's second EEO complaint as unfounded in a final agency decision on July 27, 2018.[6] Ex. YY to Stack Decl., Dkt. No. 93-53.

On August 6, 2018, plaintiff appealed the agency's decision dismissing her second EEO complaint to the Equal Opportunity Employment Commission ("EEOC"). Ex. ZZ to Stack Decl., Dkt. No. 93-54. With this EEOC appeal

---

[6] The second EEO complaint was assigned Case No. 4B-120-0003-18. The agency's written decision also references plaintiff's first EEO complaint (Case No. 4B-120-0025-16), but it is kind of unclear whether she pursued that case to an administrative conclusion and what, if any, impact that might have on the claims she has raised here in federal court. Notably, there is a brief reference to an Administrative Law Judge ("ALJ") decision rendered on February 14, 2020, Pl.'s Resp. ¶ 187, and a review of that filing indicates that it was related to plaintiff's first EEO complaint, Ex. VV to Stack Decl., Dkt. No. 93-50. So it looks like both EEO complaints were exhausted.

pending, plaintiff retired on September 28, 2018.[7]  Krul Aff. ¶ 8.  Thereafter, the EEOC affirmed the agency's decision to dismiss plaintiff's second EEO complaint on November 22, 2019.  Ex. ZZ to Stack Decl.

This civil rights action followed.

## III.  LEGAL STANDARD

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a

---

[7]  In June of 2017, plaintiff began a course of psychological treatment that included anti-anxiety medication.  Krul Aff. ¶ 82.  This treatment helped plaintiff deal with the "stressful conditions [her] work environment caused."  *Id.*  But plaintiff claims that her treating physician repeatedly advised her to retire as soon as she was eligible to do so.  *Id.*; Pl.'s Facts ¶ 262.

rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV. <u>DISCUSSION</u>

Broadly construed, plaintiff claims that District Manager Kelley subjected her to a campaign of sex-based slights and other, more tangible instances of mistreatment.  Plaintiff tried to remedy these abuses, first by making some informal complaints and later, by pursuing the official EEO process through her agency.  But Kelley, sometimes acting indirectly or perhaps in concert with others, retaliated against plaintiff.  The working environment under Kelley's supervision became so intolerable that plaintiff was forced to retire for the sake of her health.  Based on these events, plaintiff has asserted claims for sex discrimination (in Count One) and retaliation (in Count Two).

### A. <u>Preliminary Considerations</u>

Before turning to the merits of those claims, defendant's reply brief has raised three preliminary issues that must be addressed.  First, defendant argues that plaintiff's response to his moving statement of material facts is improper and, as a result, certain facts should be deemed admitted for the purpose of summary judgment.  Def.'s Reply, Dkt. No. 112 at 5–8.[8]  Second, defendant argues that plaintiff's affirmation in opposition to his motion for

---

[8]  Citations to the parties' briefing corresponds to CM/ECF rather than the internal pagination.

summary judgment should be disregarded entirely because it is conclusory or otherwise improper. *Id.* at 8–11. Third and finally, defendant argues that plaintiff's statement of additional material facts violates the Local Rules governing summary judgment and should also be disregarded. *Id.* at 11.

Why has defendant devoted so much of the limited space in his reply brief to these objections? The answer is simple: to promote some much-needed analytical clarity. When faced with a motion for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. In order to answer that bottom-line question, the Court needs to know what issues are really in dispute, and what plaintiff's version of the proof at trial would actually look like. Without both, it is tough to figure out whether a trial is warranted on some or all (or none) of plaintiff's claims. *See, e.g.*, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) ("[T]he question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.").

Defendant's objections to plaintiff's responsive submissions are grounded in the basic principles on which summary judgment is built. By way of quick review, summary judgment is a procedural tool that helps courts screen out cases where trial is unnecessary. This sometimes happens when the parties

are in agreement about the relevant facts and just need a ruling from the Court on some aspect of the law.  Perhaps more commonly, though, summary judgment involves the movant arguing that discovery has failed to produce a version of events that, if introduced at a trial and credited by a reasonable fact-finder, would be sufficient to permit a verdict in favor of the non-movant.

This latter group of cases turn on disputes over the material facts.  But it would be exceedingly difficult for courts to comb through the record produced in each civil case and reliably pluck out all the fact disputes before deciding whether there is enough in issue to set the matter down for a trial.  For one thing, this would quickly drown the Court in an avalanche of (now mostly digital) paperwork.  For another, merely identifying every possible factual dispute in an entire discovery record is not really the purpose of the summary judgment screening process.

Instead, for summary judgment, the issues that really matter are those that are both material *and* genuinely disputed.  "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters; *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law."  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (cleaned up).

The key takeaway is that "[a] reasonably disputed, legally essential issue is both genuine and material and must be resolved a trial."  *Graham*, 89 F.3d

at 79.  And those issues are easier to spot if you have knowledge of the case and an understanding of the law.  By the close of discovery, the parties are supposed to have both.  So the summary judgment procedure puts the initial responsibility for identifying these disputes on the parties, not the Court.

The process is spelled out in our Local Rules.  Briefly summarized, though, the party trying to avoid a trial (*i.e.*, the movant) is supposed to identify—in a separate document called a statement of material facts—the undisputed material facts that entitle them to judgment as a matter of law on the claim or defense at issue.  N.D.N.Y. L.R. 56.1(a).

In response, the party seeking to justify the need for a trial on that claim or defense (*i.e.*, the non-movant) is supposed to respond—in a separate-but-matching document—by admitting or denying each material fact offered by the movant.  N.D.N.Y. L.R. 56.1(b).  And for each denial, the non-movant is also supposed to identify the specific record evidence that creates a "genuine" dispute over that material fact.  *Id*.

In theory, the back-and-forth generated by this party-driven process will cut a voluminous discovery record down to a manageable size by forcing the parties to identify areas of agreement and drill down on their disputes.  This, in turn, should leave the Court in a better position to apply the undisputed facts to the law or, more commonly, to decide if the non-movant's version of events, viewed in their favor and considered in light of the rest of the record,

are sufficient to warrant a trial.  *See, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.").

In practice, though, the non-movant often resists playing the role assigned to them in this adversarial process.[9]  That can lead to several different forms of procedural error.[10]  But no matter the precise form, these errors all tend to produce the same result: the Court is left to try to figure out whether trial is appropriate without the benefit of clear briefing from the non-movant, which tends to increase the likelihood that the Court will overlook something important about the non-movant's proof.

The Local Rules offer a solution: they permit the Court to "deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not *specifically* controvert."  N.D.N.Y. L.R. 56.1(b) (emphasis added).  In theory, this is a straightforward way to smooth out

---

[9]  Although summary judgment motions are filed almost as a matter of course these days, there is some (albeit dated) authority to suggest that they are often unwarranted.  *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988) ("When a party has obtained knowledge through the course of discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in responding to the motion, he defeats that purpose; and more importantly, violates . . . Rule 11.").

[10]  Sometimes the non-movant does not even respond to a movant's statement of material facts, *Frantti v. New York*, 414 F. Supp. 3d 257, 284 (N.D.N.Y. 2019), or responds to some parts of the movant's statement of material facts but not others, *Malarczyk v. Lovgren*, 2022 WL 374271, at *5 (N.D.N.Y. Feb. 8, 2022).  Other times the non-movant responds by offering their up own opinion about what the evidence shows, *LaFever v. Clarke*, 525 F. Supp. 3d 305, 323 (N.D.N.Y. 2021), or tries to raise evidentiary objections instead of responding to the facts being offered, *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 724–25 (N.D.N.Y. 2020).

poor briefing.  And it works great when the non-movant completely fails to respond to a movant's statement of material facts, or where the non-movant's response does not actually offer anything to substantiate a genuine dispute.

But in practice, those are rarely such easy calls to make.  So rather than risk piling error upon error by applying this Local Rule too broadly, the Court typically shoulders the burden of poring through the available record on its own, double- or triple-checking each assertion of fact in an effort to determine whether it is *genuinely* in dispute or whether the non-movant just wants it to *appear* in dispute, usually because it is perceived as damaging to their case.

These background principles of law set the stage for defendant's specific procedural objections to plaintiff's responsive briefing.

### 1.  <u>**Plaintiff's Responsive Statement**</u>

First, defendant argues that plaintiff's response to his moving statement of material facts is improper because it contains dozens of purported "denials" that (a) fail to properly controvert the fact being offered; (b) lack citations to the record that would support such a denial; and/or (c) rely on evidence that is not properly admissible.  Def.'s Reply at 5.  According to defendant, any paragraphs with improper responses (about ninety in all) should be deemed admitted for the purpose of assessing this summary judgment motion.  *Id.*

In support of this contention, defendant offers multiple examples.  But it takes just one of them to understand the basic argument.  In paragraph ten

of the statement of material facts, defendant asserts that HR Manager Lynch was not plaintiff's "supervisor." Pl.'s Resp. ¶ 10. In her response, plaintiff "denies" this assertion of fact. *Id*. But plaintiff does not support this "denial" with a citation to the discovery record that says anything about whether or not HR Manager Lynch was plaintiff's "supervisor."

Instead, in support of this denial, plaintiff points to a constellation of *other* facts: plaintiff asserts "every personnel action" had to be "screened" by Lynch; any "requests for pay increases for employees" that plaintiff or others chose to promote "were approved or rejected" by Lynch; and any disciplinary actions also needed Lynch's approval. Pl.'s Resp. ¶ 10 (citing Krul Aff. ¶ 79).

So has plaintiff "specifically controvert[ed]" this particular fact or not? At first blush, it is tough to say. As defendant points out, plaintiff's response to the assertion that Lynch is not plaintiff's "supervisor" is not really a denial of Lynch's non-supervisory status; instead, it is more like "a list of HR-related activities or inquiries that, naturally, an HR manager would undertake in connection with the selection or hiring decisions [that plaintiff or other POOMs] would make." Def.'s Reply at 5.

That is certainly true. But it is not necessarily an answer to the question of whether plaintiff has specifically controverted this "supervisor" fact. After all, it is common to determine one contested fact by reference to others. And it is easy to imagine a scenario in which the parties could be embroiled in a

*genuine* dispute over whether someone exercised a measure of supervisory authority (either by policy or simply *de facto*) over another.  *Cf. Figueroa v. RSquared NY, Inc.*, 89 F. Supp. 3d 484, 491 (E.D.N.Y. 2015) (holding, in context of motion-to-dismiss in a *quid pro quo* harassment case, that the plaintiff's supervisor's cousin may have enjoyed *de facto* supervisory status).

But that is not the case here.  Instead, in the very next paragraph of her responsive statement of facts, plaintiff "admits" that HR Manager Lynch had *no* meaningful supervisory authority over her at all: Lynch could not hire or fire POOMs, could not promote or demote plaintiff, and did not rate or review plaintiff's job or work performance.  Pl.'s Resp. ¶ 11.  Indeed, plaintiff admits that she and Lynch reported to Kelley and were considered "peers."  *Id.* ¶ 12.

Based on those admissions, plaintiff has not genuinely placed in dispute the fact that HR Manager Lynch was *not* her "supervisor."  So that fact can be deemed "admitted" or considered "undisputed" for the purpose of summary judgment.  But as the foregoing discussion demonstrates, it took a searching review of several sections of multiple documents just to confirm the validity of this relatively straightforward assertion of fact.

Plaintiff almost certainly should have just conceded this fact and moved on to other matters.  To be sure, supervisory status is relevant in Title VII cases.  *See, e.g.*, *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013).  But it is entirely possible, at least in certain circumstances, to establish a viable Title

VII claim based on a co-worker's alleged misconduct.  *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 275 (2d Cir. 2016) (holding "cat's paw" theory is available under Title VII); *Vance*, 570 U.S. at 439–440 (explaining co-workers can contribute to or create a hostile work environment); *Davis v. Vermont, Dep't of Corr.*, 868 F. Supp. 2d 313, 330 (D. Vt. 2012) (noting that "employers may be held liable for harassment by third parties when that conduct creates a hostile work environment").

This is not a comprehensive list of the possible scenarios.  But in any one of them, plaintiff would still be on the hook to explain how Lynch might have been involved in some kind of actionable misconduct.  As discussed in greater detail *infra* and as a review of the factual narrative in II.B shows, plaintiff has not done that.

For instance, although she accuses named and unnamed HR employees of making paperwork or other mistakes that embarrassed and/or humiliated her, plaintiff does not really articulate how Lynch was responsible for any of these incidents (other than just the bare, unstated inference that, as HR Manager, she must have directed all this alleged misconduct).

To the extent plaintiff might have sought to make a better showing than that, the Local Rules provide the party opposing summary judgment with an opportunity to bring to the Court's attention other facts that, though not relied upon by the movant, may still bear on the motion.  N.D.N.Y. L.R.

56.1(b).  That would have been a suitable place to include any additional, relevant facts about Lynch's role in the story (in fact, plaintiff filed a lengthy Statement of Additional Material Facts, which will be discussed in a minute).

In addition to this (non)-issue about Lynch's status, defendant's reply brief offers other examples tending to show that the same or similar shortcomings are repeated throughout plaintiff's response.  For instance, as defendant correctly argues, plaintiff repeatedly offers a "denial" that is not accompanied by a "citation to the record" that "specifically controvert[s]" the fact.  Instead, plaintiff often responds with a narrative that includes other facts, conclusory legal arguments, and/or attempts to re-characterize the fact being offered.

In sum, when measured against the relevant background legal principles, and upon review of the arguments in defendant's reply briefing, defendant is correct that a number of plaintiff's responses to his moving statement of material facts either violate the Local Rules or are otherwise deficient in the sense that they do not appropriately controvert certain facts being offered.

However, the Court has determined that it cannot just deem admitted every one of the ninety or so problematic paragraphs identified by defendant in his reply brief.  Although it would certainly streamline consideration of this motion practice, it would be a procedural error in its own right.  There are two separate reasons for this conclusion:

*First*, as the foregoing discussion of the fact of Lynch's supervisory status vis-à-vis plaintiff shows, a too-sweeping application of this Local Rule risks overlooking important context in this record—the additional facts offered by plaintiff in support of her "denials," once stripped of speculative assertions and legal conclusions, are often useful to the analysis in this case.

*Second*, and more importantly, defendant's arguments on this procedural issue are not entirely correct.  This is because defendant relies in part on the premise that plaintiff's affirmation in opposition to summary judgment (on which many of the assertions in her responsive statement of material facts are based) is improper and should not be considered at all.  But as explained in detail below, plaintiff's affirmation (at least to the extent it is based on her own personal knowledge) must still be considered as part of this analysis.

In sum, and for the foregoing reasons, defendant's blanket request to deem admitted the entire list of challenged facts set forth in plaintiff's response (about ninety paragraphs in total) must be denied.  Def.'s Reply 5–8 (listing paragraphs defendant seeks to have admitted).  Instead, defendant's request will be granted in part as follows.

The Court has examined the record materials identified as relevant by both parties, analyzed the specific paragraphs challenged as deficient by defendant, and relied on the appropriately offered and supported facts to develop the factual narrative set forth in section II.B, *supra*.  To the extent

that various disputed facts have been identified in that section, they will be viewed in the light most favorable to plaintiff for purposes of this analysis.

### 2.  **Plaintiff's Affirmation**

Second, as just mentioned, defendant argues that plaintiff's affirmation in opposition to summary judgment is improper because it includes "statements not based on her own personal knowledge, conclusory statements that are nothing more than speculation, and improper legal arguments rather than facts."  Def.'s Reply at 8.  Alternatively, defendant argues this affirmation is improper because it runs afoul of the "sham issue of fact" doctrine.  *Id.* at 10.  In defendant's view, either one of these problems (or the force of both) justify disregarding plaintiff's affirmation in its entirety.  *Id.* at 9–11.

Upon review, defendant's request will be granted in part.  When it comes to a non-expert fact witness, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).

Defendant's reply briefing identifies a number of paragraphs in plaintiff's affirmation that violate these basic limitations.  For instance, in paragraph fifty-four, plaintiff avers that, "[u]pon information and belief, Sands shared [certain] information with Kelley as they were friends."  Krul Aff. ¶ 54.  But

"information and belief" is not a substitute for personal knowledge.  *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004).

Elsewhere, in paragraph fourteen, plaintiff avers that Kelley refused to select plaintiff as Acting Finance Manager because "he sought to prevent [her] from acquiring experience and his reason for selecting Raso instead of [her] is . . . pretext."  Krul Aff. ¶ 14.  But absent more, this is just plaintiff's speculation about Kelley's mental state joined to a legal conclusion, neither of which are ordinarily established by a lay witness's affidavit.  *See Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 163 (E.D.N.Y. 2012) (explaining that the relevant test is "whether a reasonable trier of fact could believe the witness had personal knowledge" of the fact at issue).

Defendant's reply brief points out some additional examples, but reciting them here would only belabor the point.  In short, defendant is correct that certain portions of plaintiff's affirmation violate the basic rules governing affidavits.  Notably, however, other portions of this affirmation appropriately set forth facts about which plaintiff would be competent to testify at a trial.

So this partial problem requires a partial remedy.  The Second Circuit has held that a court may strike or simply disregard portions of an affidavit or affirmation that are not based on personal knowledge or that are otherwise inadmissible.  *See, e.g.*, *Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34

(2d Cir. 2013) (summary order); *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*, 2004 WL 912599, at *4 (S.D.N.Y. Apr. 29, 2004) (collecting cases).

Consistent with that approach, the improper or inadmissible aspects of plaintiff's affirmation will be disregarded and have not been included in the factual narrative. However, the permissible portions have been included in section II.B will be considered as part of this analysis. *Cf. Flaherty v. Filardi*, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) (adopting similar approach and refusing to subject the challenged document to line-by-line scrutiny).

In the alternative, defendant argues that plaintiff's affirmation should still be disregarded in its entirety because it violates the "sham issue of fact" doctrine. This doctrine sometimes comes into play when a party swears out an affidavit in opposition to summary judgment that contradicts their prior deposition testimony, all-too-perfectly placing in dispute certain material facts that appeared undisputed at the close of discovery.

Of course, the party might later have to answer for those contradictions on the witness stand, but that would be a cold comfort to the movant wrongfully forced into the time and expense of trial. So the law recognizes a safety valve that permits courts to disregard these so-called "sham" issues of fact. As the Second Circuit has explained:

> [a] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the

> affiant's previous deposition testimony. If a party who
> has been examined at length on deposition could raise
> an issue of fact simply by submitting an affidavit
> contradicting his own prior testimony, this would
> greatly diminish the utility of summary judgment as a
> procedure for screening out sham issues of fact. Thus,
> factual issues created solely by an affidavit crafted to
> oppose a summary judgment motion are not "genuine"
> issues for trial.

*Kennedy v. City of N.Y.*, 570 F. App'x 83, 84 (2d Cir. 2014) (summary order)

(quoting *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).

In theory, this doctrine "vindicate[s] the utility of summary judgment as a

procedure for screening out sham issues of fact" by recognizing that priority

should be assigned to "testimony subject to cross-examination (such as

deposition testimony)." *A.B. ex rel. Alverez v. United States*, 2019 WL

10302175, at *14 (S.D.N.Y. Apr. 17, 2019) (citation omitted).

In practice, however, the doctrine sets an impossibly high bar. Indeed, the

Second Circuit has repeatedly cautioned that a contradictory affidavit cannot

be disregarded as a "sham affidavit" unless the contradiction with the earlier,

sworn testimony is "real, unequivocal, and inescapable." *Rivera v. Rochester

Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014); *see also In re

Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013) (requiring the

contradiction to be "unequivocal and inescapable, unexplained, [arising] after

the motion for summary judgment was filed, and [ ] central to the claim at

issue"). Measured against these realities, defendant's request to completely disregard plaintiff's affirmation as a "sham affidavit" must be denied.

### 3.  **Plaintiff's Additional Facts**

Third and finally, defendant argues that plaintiff's statement of additional material facts is improper.  Def's Reply. at 11.  In defendant's view, the Local Rules do not permit this kind of document to be filed in opposition to a motion for summary judgment.  *Id*.  Even assuming otherwise, defendant argues that plaintiff's statement is "full of legal conclusions and improper argument."  *Id*.

As relevant here, the Local Rules permit a non-movant to include in their response to the movant's statement of material facts "any assertions that the opposing party contends are in dispute in a short and concise Statement of Additional Material Facts in Dispute."  N.D.N.Y. L.R. 56.1(b).[11]

Upon review, many of the assertions in plaintiff's statement of additional material facts are taken directly from plaintiff's affirmation in opposition to summary judgment.  As explained *supra*, that affirmation will be considered to the extent that it contains assertions properly within plaintiff's personal knowledge (rather than speculation, conjecture, and/or legal argument).

---

[11] Although this section of the Local Rule speaks about additional *disputed* facts, non-movants often include other, purportedly *undisputed* facts as well (which is why the Local Rule permits the movant an opportunity to reply to these new assertions).  In any event, to the extent defendant's argument about this document is grounded in this disputed/undisputed issue, it is rejected.

Even so, defendant is correct to argue that other parts of this statement of additional material facts are improper.  For instance, this document presents certain portions of the story in a paragraph-length, argumentative, narrative form.  These are not the kind of "short and concise" assertions of "additional" facts that are contemplated by the Local Rules.

In sum, the statements in this document that are just duplicative of the averments in plaintiff's affirmation and those that amount to speculation, improper legal argument, and/or conclusory assertions will be excluded from consideration.  However, the relevant, non-conclusory, non-duplicative assertions of fact that are recited in this document (and properly supported, usually by plaintiff's affirmation but sometimes with other record evidence) will be considered as set forth in the factual narrative in section II.B.

## B.  <u>The Merits</u>

Those threshold conclusions lead to the merits of plaintiff's remaining Title VII claims for sex discrimination (in Count One) and retaliation (in Count Two).  Broadly speaking, these two claims are based on the series of events that began when Kelley became plaintiff's supervisor on October 28, 2014, and ended when plaintiff retired on September 28, 2018.

Title VII "prohibits employment-related discrimination on the basis of race, color, religion, sex, or national origin and retaliation against employees who complain about discrimination." *Tassy v. Buttigieg*, 51 F.4th 521, 529

(2d Cir. 2022) (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008)).  Since 1972, Title VII's protections have extended to most federal employees, including U.S. Postal Service workers.  42 U.S.C. § 2000e-16(a).

## 1. **Count One – Sex Discrimination**

Plaintiff's Title VII sex discrimination claim implicates three conceptually distinct theories of relief: (a) instances of "disparate treatment" based on her sex; (b) that, along with the force of other related evidence, created a "hostile work environment"; which led, finally, (c) to her "constructive discharge."

### a. **Disparate Treatment**

First, plaintiff complains about instances in which Kelley treated her less favorably than others because she is a woman.  In other words, plaintiff has alleged "disparate treatment" based on her "sex," which can be actionable if the defendant had a discriminatory intent or motive in taking the adverse employment-related action against the plaintiff.  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988).[12]

An employer's discriminatory intent or motive can always be proven with direct evidence.  *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989).  Direct evidence exists when "an impermissible criterion was *in fact* a

---

[12]  A disparate treatment claim can also be pleaded as a "pattern-or-practice suit," which is when a class of plaintiffs challenge an employer's standard operating procedure(s).  *See, e.g.*, *United States v. City of N.Y.*, 717 F.3d 72, 82 (2d Cir. 2013).  Title VII also protects employees from facially neutral employment practices that have a "disparate impact."  *See, e.g.*, *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208 (2d Cir. 2020).  Plaintiff has not attempted to assert either kind of claim, which would fail.

'motivating' or 'substantial' factor in the employment decision." *de la Cruz v. N.Y. City Human Res. Admin. Dep't*, 82 F.3d 16, 23 (2d Cir. 1996) (emphasis in original) (citations omitted).

Direct evidence can be shown by "a workplace policy, practice or decision [that] relies expressly on a protected characteristic," *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015), or through "conduct or statements by person involved in the decision[-]making process that may be viewed as directly reflecting the alleged discriminatory attitude," *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992).

But direct evidence of intent is usually hard to find. *See, e.g.*, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (recognizing that an employer's intent and state of mind are "usually unstated"). After all, "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).

So most discrimination cases rely on the force of indirect proof. *Rosen,* 928 F.2d at 533 ("A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence."); *Sublett v. John Wiley & Sons*, 463 F.3d 731, 736–37 (7th Cir. 2006) (characterizing indirect method of proof as the "more common" approach to establishing a Title VII claim).

At summary judgment, a plaintiff can establish a disparate treatment claim based on indirect evidence: (1) by showing that the employer's stated reason for the challenged employment action was actually a "pretext" to cover-up unlawful discrimination; or (2) "by otherwise creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination.'" *Vega*, 801 F.3d at 87 (quoting *Gallagher v Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)).

A showing of "pretext" is the most common method for defeating summary judgment.  To do so, the plaintiff must satisfy the evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (distinguishing this evidentiary framework from the ultimate burden of proof at trial).

Under this three-part burden-shifting framework, "(1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of 'discrimination *vel non;*' and thus, (3) the burden shifts back to the plaintiff 'to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Hong Yin v. N. Shore LIJ Health Sys.*, 20 F. Supp. 3d 359,

371 (E.D.N.Y. 2014) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

### i. Timeliness & Exhaustion

As an initial matter, however, defendant argues that any disparate treatment claims that might be based on events or conduct that occurred before July 23, 2016 are time-barred.  Def.'s Mem., Dkt. No. 93-1 at 17.  As defendant explains, federal employees seeking to challenge as discriminatory a discrete, job-related action are required to "initiate contact" with an EEO Counselor within 45 days of the challenged action.  *Id.*  Because plaintiff did not "initiate" this EEO contact until September 6, 2016, any claims based on discrete, job-related actions outside of a 45-day lookback period have not been properly exhausted and are therefore time-barred.  *Id.*

In opposition, plaintiff acknowledges this EEO-contact requirement but argues that it does not bar her claims because the acts she has identified are part of a single "continuing violation."  Pl.'s Opp'n at 19.[13]  In the alternative, plaintiff claims that courts "have excused strict compliance with the 45[-]day requirement . . . when the employee has contacted an [*sic*] someone that is intimately involved in the EEO process[,] such as [HR Manager] Lynch."  *Id.*

---

[13] Plaintiff's opposition on this point jumps right into a defense of her hostile work environment claim.  Pl.'s Opp'n at 17.  But that claim is analytically distinct and will be discussed *infra*.

To that end, plaintiff argues that she contacted HR Manager Lynch "on repeated occasions to complain of discrimination and retaliation." Pl.'s Opp'n at 19. According to plaintiff, it would be "unfair" to limit her claims on this basis because USPS's written anti-discrimination policy "does not state that employees **must** contact an EEO counselor within 45 days if they wish to preserve their claims (instead advising them that they 'should.'"). *Id.*

In reply, defendant argues that informal complaints to Lynch or other HR personnel are insufficient to satisfy the EEO-contact requirement imposed on federal employees. Def.'s Reply at 12. In defendant's view, the fact plaintiff admits she eventually met with an "EEO counselor" serves to underscore the distinction between an agency's HR employees and an "EEO counselor." *Id.* According to defendant, courts have routinely rejected this kind of attempt to avoid the 45-day exhaustion requirement for discrete acts. *Id.*

Title VII's federal-sector provision imposes "rigorous" requirements on a plaintiff seeking to file a lawsuit. *Brown*, 425 U.S. at 832. "When Congress extended Title VII to the federal workplace, it gave agencies the 'primary responsibility' for resolving discrimination complaints and eliminating employment discrimination." *Webster v. Del Toro*, 49 F.4th 562, 655 (D.C. Cir. 2022) (citing *Brown*, 425 U.S. at 832). Accordingly, a federal employee cannot sue her agency-employer in federal court unless she has exhausted her administrative remedies. *Green v. Brennan*, 578 U.S. 547, 552 (2016).

To do so, the federal employee must file "a charge of discrimination with the EEO division of their agency." *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006).  The entire process is set out in regulations promulgated by the Equal Employment Opportunity Commission ("EEOC").  *Green*, 578 U.S. at 553.  As relevant here, though, the plaintiff "must initiate contact with a[n] [EEO] [c]ounselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).

This "45-day period serves as a statute of limitations; thus, as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred." *Tassy*, 51 F.4th at 531 (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)).

Measured against this general body of law, plaintiff's Title VII claims for disparate treatment based on any discrete acts that occurred before July 23, 2016 are time-barred because they are unexhausted.  This includes each of the complained-of acts set forth in section II.B.1 through II.B.9: (1) Kelley's "unusual" request for justification of plaintiff's "routine" hiring decision; (2) Kelley's decision to appoint HR Specialist Simmons to the Jamesville post office over plaintiff's objection; (3) the delayed hiring of OIC Hotaling to backfill the Jamesville position; (4) Kelley's lack of action on plaintiff's

request to shadow or detail in Finance; (5) Kelley's lack of action on plaintiff's request to shadow or detail in HR; (6) the change in plaintiff's responsibilities and workload as a result of the 2015 realignment; (7) the reassignment of the "level 21" offices to other female POOMs after plaintiff complained; (8) the one-time SPOT award given to someone else; (9) plaintiff's "forced" relocation to Fort Plain; (10) the fact that Fort Plain was in a state of serious disrepair; (11) Kelley's imposition of unfair LSS project deadlines; (12) Kelley's criticism of plaintiff's disciplinary decisions during two staff meetings; (13) Kelley's "exploding" offer to return to the Utica area; (14) Kelley's failure to consult plaintiff about hiring her replacement POOM; (15) the addition of two post offices to plaintiff's new POOM area; and (16) Kelley's mocking criticism of plaintiff during a June 2016 meeting.

Even assumed true and viewed in the light most favorable to her, the fact that plaintiff made sporadic, informal complaints to HR Manager Lynch does not alter this conclusion.  To be sure, there is extra-circuit authority holding that "a complainant may satisfy the criterion of EEO Counselor contact by initiating contact with any agency official logically connected with the EEO process, even if that official is not an EEO counselor, and by exhibiting an intent to begin the EEO process." *Kraus v. Presidio Trust Facilities Div.*, 572 F.3d 1039, 1044–46 (9th Cir. 2009) (cleaned up).

But the Ninth Circuit's employee-friendly approach to this EEO-contact requirement still has limits.  To conclude otherwise would just encourage the proliferation of *ad hoc* exceptions that would soon swallow up the regulatory rule.  Indeed, courts considering this quasi-exception to the EEO-exhaustion requirement have concluded "that simply complaining to one's supervisors or to an agency's human resources department is not sufficient." *Tocci v. Napolitano*, 791 F. Supp. 2d 994, 1004 (D. Or. 2011) (acknowledging "contact with the agency's designated EEO counselor" is not necessarily required but concluding that plaintiff's informal contacts with his own HR department were insufficient to satisfy the Ninth Circuit's standard under *Kraus*).

To the extent plaintiff suggests that permissive language in her agency's anti-discrimination policy—which uses the word "should"—somehow failed to put her on sufficient notice of the forty-five-day period for making initial EEO contact, that argument must also be rejected.

First, as defendant points out, at least one other trial court in our Circuit has already rejected this exact argument.  *Pauling v. Sec. of Dep't of Interior*, 960 F. Supp. 763, 805 (S.D.N.Y. 1997) ("The poster indicated the appropriate course of events, and any difference in connotation between 'should' and 'must' is not sufficient to raise a material issue of fact.").

Second, plaintiff concedes that she received "formalized" EEO training on a regular basis.  Pl.'s Resp. ¶ 183.  Bear in mind that plaintiff was not just a

line worker or lower-level employee.  Plaintiff was a higher-level manager who supervised operations (including human resources issues) across sixty to seventy post offices.  In short, plaintiff was clearly on notice of this regulatory exhaustion requirement.  Accordingly, plaintiff's informal complaints did not satisfy or excuse compliance with the exhaustion requirement.

Finally, in a last-ditch attempt to save these time-barred claims, plaintiff's brief invokes the "continuing violation" doctrine.  "The continuing violation doctrine, where applicable, provides an 'exception to the normal knew-or-should-have-known accrual date.'" *Tassy*, 51 F.4th at 532 (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015)).

"The doctrine applies to claims composed of a series of separate acts that collectively constitute one unlawful practice, and functions to delay the commencement of the statute of limitations period until the last discriminatory act in further of the broader unlawful practice." *Tassy*, 51 F.4th at 532 (cleaned up).  "If a continuing violation is found, a court must then consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Banks*, 81 F.4th at 259 (cleaned up).

Importantly, though, the continuing violation doctrine does not apply to "'discrete acts of discrimination or retaliation that occur outside the statutory time period,' even if other [related] acts of discrimination occurred within the

statutory time period." *Tassy*, 51 F.4th at 532 (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004)).  "Rather, the doctrine extends exclusively 'to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment.'" *Id.* (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020)).

Upon review, the continuing violation doctrine does not save plaintiff's time-barred disparate treatment claims because, even assuming that one or more of these job-related acts were sufficiently "material" as to be actionable (as discussed *infra*), any and all of these disparate treatment claims would be based on a discrete event of which she was aware.

Although the doctrine applies to plaintiff's hostile work environment claim (which will be discussed *infra*), the Second Circuit has repeatedly rejected attempts by plaintiffs to use the continuing violation doctrine to resurrect time-barred disparate treatment claims arising from discrete acts.  *Tassy*, 51 F.4th at 532.  Accordingly, defendant is entitled to summary judgment on any and all disparate treatment claims that might be based on discrete acts that occurred before July 23, 2016.

### ii. **Materiality & Adverse Action**

As to any of these timely claims for disparate treatment, defendant argues that none of the remaining job-related actions identified by plaintiff qualify as "adverse employment actions" within the meaning of Title VII.  Def.'s

Mem. at 19.  As defendant explains, Title VII imposes a threshold materiality requirement intended to screen out claims based on trivial harms or ordinary workplace occurrences.  *Id.*  According to defendant, the timely instances of alleged disparate treatment identified by plaintiff are based on little more than her idiosyncratic, subjective feelings.  *See id.*

Plaintiff responds that a job-related action can still be "adverse" even if it does not involve a reduction in an employee's "rank or salary."  Pl.'s Opp'n at 21.  In support of that argument, plaintiff identifies cases in which courts have recognized that non-pecuniary job-related actions—such as a more taxing commute or an unfairly heavy workload—can qualify as sufficiently "adverse" to satisfy this requirement, even if those adverse actions did not have a direct impact on the employee's salary, title, or status.  *Id.* at 21–22.

"Title VII is not 'a general civility code for the America workplace.'"  *Krul*, 501 F. Supp. 3d at 96 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  As a result, only those job-related actions that amount to "a materially adverse change in the terms and conditions of employment" are actionable under Title VII.  *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

"This materiality requirement works to screen out discrimination claims that are based on 'everyday workplace grievances, disappointments, and

setbacks.'" *Krul*, 501 F. Supp. 3d at 97 (quoting *Cunningham v. N.Y. State Dep't of Labor*, 326 F. App'x 617, 620 (2d Cir. 2009) (summary order)); *see also Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (holding that complained-of job action must create "a materially significant disadvantage" in the plaintiff's working conditions).

"The category of employment decisions that constitute adverse actions is 'broad' in scope." *Banks*, 81 F.4th at 269 (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)). As plaintiff argues, this "broad" approach can even sweep in job-related actions that do not cause financial or economic harm. *Id*. (holding that "economic harm" not required "for an employment decision to be actionable under Title VII"). Although there is no exhaustive list of what qualifies as materially adverse, "[a]ctionable discrete acts are often easy to identify, generally because they involve material changes to an employee's conditions of employment." *Tassy*, 51 F.4th at 529 (cleaned up).

Examples include job actions like a discharge or demotion, the denial of a provisional or permanent promotion, the addition of more responsibilities, an involuntary transfer that entails objectively inferior working conditions, the denial of benefits, the denial of a requested job accommodation, the denial of training opportunities that may lead to promotional opportunities, or a shift assignment that makes a normal life difficult. *See, e.g.*, *Little v. Nat'l Broad. Co., Inc.*, 210 F. Sup. 2d 330, 377 (S.D.N.Y. 2002) (collecting cases). Simply

put, "[a]n adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Krul*, 501 F. Supp. 3d at 97 (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)).

Measured against this general body of law, and even viewed in the light most favorable to the non-movant, none of the timely discrete acts; *i.e.*, those that occurred on or after July 23, 2016, are sufficiently "material" to qualify as "adverse" under Title VII.

As an initial matter, though, it is worth reciting at some length plaintiff's basic approach to formulating an argument that might support a contrary conclusion sufficient to warrant a trial.  According to plaintiff's brief:

> Kelley advanced the careers of male employees while denying career advancement opportunities to Plaintiff and other women.  Kelley did not allow Plaintiff to serve in any detail while he appointed male employees, including Steve Sheffer and Tony Hall, to such temporary positions.  Kelley did not consider higher performing females to replace Plaintiff in the POOM East area, and the employee Kelley chose, Mr. Hall[,] was not.  He treated male employees better with respect to pay increases and bonuses.  The average promotional increase given to men was 12.2% while the women were given 10.5%.

Pl.'s Opp'n at 22.

This might be fine as a general summary of the proof.  It is also a fine way to provide some context about plaintiff's working environment.  But there are

a couple problems with this as a legal argument in support of any potential claim for *disparate treatment*. First, putting aside the lack of citations to the record, this argument is phrased almost entirely in generalities. Second, to the extent plaintiff does offer supporting details (in this section of her brief or any other), they often amount to bare accusations of misconduct rather than coherent arguments about how a particular instance of disparate treatment harmed plaintiff in a materially adverse way.

Indeed, although the next two pages of plaintiff's brief identify in slightly more detail certain specific, discrete events that might be viewed as possible claims for disparate treatment, the supporting arguments on those points are still conclusory, lacking citations, and nearly always phrased so broadly as to make meaningful analysis of any single possible disparate treatment claim a challenge. Pl.'s Opp'n at 24 ("The evidence as adduced by Plaintiff in this case shows a pattern by both Kelley and Lynch giving preferential treatment to male colleague [*sic*] of Plaintiff and, to be fair, engaged in significant and unexplained changes or deviations from established practices in the selection, promotion, announcements of appointments, and assignments meted out to Plaintiff.") *id.* ("The fact that Plaintiff's input was not sought and in most instances rebuffed or ignored while the male employees and POOMS [*sic*] were given preferential territory, workloads, and even bonuses is evidence of discrimination on the basis of gender."); *id.* at 25 ("That Kelley demanded

faster performance standards from Plaintiff as opposed to the men under his authority is relevant evidence of bias . . . .").

What should a court do with this kind of briefing?  As a general matter, it is not a court's duty to make a counseled plaintiff's case for them by figuring out which conclusory, generalized assertion matches up with an event that might or might not be described in sufficient detail elsewhere.  These failures are especially frustrating here because the materiality and adverse-action requirements were already explained to plaintiff's counsel at the motion-to-dismiss stage of this case.

There, the Court set out these legal standards, reviewed plaintiff's operative pleading, and concluded that she had plausibly alleged "several adverse employment actions that resulted in material disadvantage."  *Krul*, 501 F. Supp. 3d at 97.  At that time, however, *Krul* cautioned that plaintiff would still need to "pair these allegations with facts in discovery tending to support them" if she planned to survive beyond summary judgment.  501 F. Supp. 3d at 97.

It is hard to tell whether plaintiff has actually managed to do this with any particular claim for disparate treatment.  This is because, as with other aspects of her briefing, she offers little to no guidance on her theory of the

case.[14]  Instead, as she does elsewhere with her other claims, plaintiff's brief tends to just recite the general legal standard and then invites the Court to figure out how any specific facts and the law might line up with each other.

With that reality in mind, the Court will proceed to analyze the sufficiency of any disparate treatment claims.  First off, as noted *supra*, the discrete acts that occurred before July 23, 2016 have not been exhausted.  Thus, only a subset of events remain for consideration as possible "disparate treatment" claims.  This subset of timely events are set forth in section II.B.10 through II.B.17.

Plaintiff has not said whether or not she exhausted each of these possible disparate treatment claims (or any of them, for that matter).  Defendant, for his part, seems to treat any possible claims for disparate treatment based on events that occurred after the July 23, 2016 cut-off (calculated from plaintiff's EEO contact) as timely and therefore warranting of further legal analysis.

Defendant's approach is the best course of action.  "In Title VII cases, the scope of the complaint brought before the administrative agency limits the scope of subsequent civil proceedings in federal court; in other words, plaintiffs may pursue only those claims that could reasonably be expected to

---

[14]  A review of this section suggests that plaintiff is trying to argue her hostile work environment claim rather than any particular disparate treatment claim.  Out of an abundance of caution, these arguments will be considered as part of her hostile work environment claim, too.

grow out of the administrative charges." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099–1100 (7th Cir. 2013).

However, "[t]he informal EEO process, which is commonly pursued *pro se*, does not require [ ] elaborate argumentation by claimants." *Coleman v. Duke*, 867 F.3d 204, 211 (D.C. Cir. 2017).  The Second Circuit has "long recognized that in certain circumstances it may be unfair, inefficient, or contrary to the purposes of the statute to require a party to separately re-exhaust new violations that are 'reasonably related' to the initial claim." *Duplan v. City of N.Y.*, 888 F.3d 612, 622 (2d Cir. 2019).

As a result, any possible "timely" disparate treatment claims will be considered exhausted as "reasonably related" to one or both of plaintiff's EEO charges.  *Mathirampuzha*, 548 F.3d at 76 (explaining how this relatedness doctrine can sometimes operate to "relax[ ]" the exhaustion requirement).

But even viewed in the light most favorable to plaintiff, it is immediately obvious that the discrete acts set forth in this section, especially given the absence of any meaningful supporting detail, are clearly non-actionable as disparate treatment because they are trivial harms and petty grievances:

> - The fact that plaintiff doled out some of her own SPOT award money to her former supervisees after Tony Hall failed to respond to her requests for information.

- The fact that Kelley denied a SPOT award to a non-party employee on a single occasion.

- The fact that Kelley complained about plaintiff to the IG, who took no action.

- The fact that plaintiff was not invited to the coffee recognition event.

- The fact that Kelley sat near plaintiff at the Oneida Golf Course event.

- The fact that Kelley gave plaintiff a SPOT award.

- The fact that Kelley denied plaintiff's request for an unnamed postmaster to be returned from a "detail" in Albany.

- The fact that HR Manager Lynch and others became "uneasy" around plaintiff and began to "avoid" her after she filed her EEO complaint.

- The fact that HR employees made four mistakes that affected other USPS employees and embarrassed plaintiff.

- Absent more, the fact that Kelley granted certain award requests by male colleagues more quickly than the ones she submitted to him.

- The fact that Kelley and HR Manager Lynch refused to permit plaintiff to communicate with them *solely* by e-mail.

- The fact that unnamed people in the HR department "held up" certain vacancy postings after plaintiff complained to Theresa Bruso.

In short, even accounting for the case-specific nature of the "materiality" requirement, none of these discrete acts bear any of the indicia of a qualifying

adverse employment-related action.  Simply put, these actions do not involve a materially disadvantageous change in the terms and conditions of plaintiff's working situation.  Accordingly, defendant is entitled to summary judgment on any disparate-treatment claims based on these discrete events.

Notably, there are two timely, discrete acts described in section II.B that stand out as *possibly* material and therefore warranting of scrutiny.  First, plaintiff contends that Kelley failed to respond to her request, made by e-mail on or about July 11, 2017, to pursue a training opportunity, or "IDP," as part of an executive leadership program in which she was enrolled.

"Training is a benefit of employment that receives protection under Title VII." *La Grande v. DeCrescente Distrib. Co., Inc.*, 370 F. App'x 206, 211 (2d Cir. 2010) (summary order).  So the denial of a training opportunity might qualify as a materially adverse job-related action.  *Id.*  But in order to qualify, courts require some minimal showing that the employee suffered a "material harm" from the particular denied opportunity, "such as a failure to promote or a loss of career advancement opportunities." *Trachtenberg v. Dep't of Educ.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (citation omitted).

This requirement has not been met.  Plaintiff does not even attempt to connect this "denial" of a training opportunity to any particular "material harm," such as a specific missed promotion or a denied instance of career advancement.  Contrast that failure of proof with plaintiff's (time-barred)

claim of a missed promotion opportunity during the 2015 POOM realignment, where plaintiff specifically asserts that she lost out on a promotion because the "level 21" offices were reassigned (to another woman).  Krul Aff. ¶ 34.

Second, as part of the 2017 POOM realignment, Kelley assigned plaintiff the Cortland post office, which was outside of her territory and a well-known source of problems.  The assignment of a "disproportionately heavy workload" can sometimes qualify as a materially adverse action.  *Cherry v. N.Y. City Hous. Auth.*, 564 F. Supp. 3d 140, 166 (E.D.N.Y. 2021) (collecting cases).  But courts typically require a showing that the work "significantly changed the employee's responsibilities so as to diminish that worker's role or status, or exposed the worker to dangerous or extreme conditions not appropriate to her job classification."  *Chacko v. Connecticut*, 2010 WL 1330861, at *7 (D. Conn. Mar. 30, 2010) (citation omitted).

That showing has not been made, either.  Plaintiff complains in general terms that the Cortland post office had "well-known personnel and safety issues."  But the discovery record establishes that each POOM is responsible for supervising between sixty and seventy post offices of varying size and difficulty.  Plaintiff has offered no indication about how the reassignment of this single office "significantly changed" her workload.  Contrast this wholly generalized complaint with her (time-barred) claim of being assigned to an unsafe space in Fort Plain, which is set out greater detail.  Krul Aff. ¶ 43.

In sum, then, none of plaintiff's timely discrete acts suffice to establish a disparate treatment claim because they are not sufficiently "material" for purposes of Title VII.  However, assuming that one (or more) of these timely acts qualified as "material," the next question on summary judgment would be whether plaintiff has adduced evidence to support the other requirement of her *prima facie* case: showing that a particular adverse action occurred under circumstances giving rise to even a minimal inference of discrimination on the basis of her protected characteristic; *i.e.*, her sex or gender.

### iii.  <u>Minimal Inference of Discrimination</u>

Defendant argues that plaintiff has not done so.  According to defendant, even if one or more of these timely discrete acts were materially adverse, "there is no evidence that the conduct about which [plaintiff] complains occurred <u>because of</u> her gender."  Def.'s Mem. at 22.  In defendant's view, plaintiff's "complaints are most appropriately characterized as differences of opinion as to managerial decisions and personality conflicts with Kelley or [HR Manager] Lynch."  *Id*. at 24.

In opposition, plaintiff claims that "there is ample evidence that Plaintiff's male colleagues were treated more favorably than her as set forth in the responses to" the statements of material fact.  Pl.'s Opp'n at 23.  In plaintiff's view, for "each instance" of mistreatment identified by defendant, "there is evidence that Plaintiff's gender was a consideration."  *Id*.

In reply, defendant argues that "much of [plaintiff's] argument stems from self-serving, speculative, and conclusory statements that are not based on her own personal knowledge." Def.'s Reply at 14. According to defendant, once you "[s]et[ ] aside [plaintiff's] rhetoric and conclusory statements, she fails to meet her burden at this stage of the proceedings." *Id*.

As explained *supra*, the *McDonnell Douglas* framework puts the initial burden on the plaintiff to make out a *prima facie* showing of discrimination by establishing that: (1) she is a member of a protected class; (2) who is qualified for her position; (3) she suffered an adverse job action; and (4) the circumstances give rise to a minimal inference of discrimination on the basis of a protected characteristic. *See, e.g.*, *Musante v. Mohawk Vall. Cmty. Coll.*, 270 F. Supp. 3d 564, 577 (N.D.N.Y. 2017).

Neither party disputes that plaintiff is a (1) member of a protected class who was (2) qualified for her job. And as just explained, it is possible, at least when viewed in her favor for summary judgment, that she (3) suffered one or more materially adverse actions. Thus, the remaining question at step one of the *McDonnell Douglas* framework is whether the circumstances under which a particular job-related action occurred give rise to a minimal inference of discrimination on the basis of her sex.

"The plaintiff's burden of proof as to this first step has been characterized as minimal and *de minimis*." *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d

834, 844 (2d Cir. 2013) (cleaned up).  As relevant here, the fourth element of

a plaintiff's *prima facie* case "'is a flexible one that can be satisfied differently

in differing factual scenarios.'"  *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x

11, 17 (2d Cir. 2018) (summary order) (quoting *Chertkova v. Conn. Gen. Life

Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  As the Second Circuit has explained:

> Circumstances contributing to a permissible inference
> of discriminatory intent may include the employer's
> continuing, after discharging the plaintiff, to seek
> applicants from persons of the plaintiff's qualifications
> to fill that position, or the employer's criticism of the
> plaintiff's performance in ethnically [or sexually]
> degrading terms, or its invidious comments about
> others in the employee's protected group, or the timing
> of the discharge.

*Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (cleaned

up).  Notably, this is not an exhaustive list.  For instance, the plaintiff could

also show that similarly situated employees outside her protected class were

treated more favorably with regard to the job-related action at issue or even

point to biased comments by the decisionmaker involved in the challenged

action.  *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012).

Even measured against this lenient standard, plaintiff has not made a

threshold showing that any timely discrete act, including Kelley's failure to

respond to plaintiff's IDP training e-mail and his later decision to reassign

the Cortland post office, might have been motivated by sex discrimination.

First, as defendant argues, plaintiff has not shown how any particular male colleague; *i.e.*, a co-worker similarly situated to her, was treated more favorably in connection with these acts. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (explaining that inference of discrimination can be established by identifying a similarly situated comparator). Nor has plaintiff identified any of the other indicia that might permit a minimal inference of a discriminatory motive. Instead, even with the Cortland office reassignment, plaintiff just avers in conclusory fashion that other men were treated better.

Elsewhere, plaintiff has identified a couple comments by Kelley that could be viewed by a rational fact-finder as "disrespectful" and might qualify as "biased comments by a decisionmaker" in light of the very minimal burden imposed by the *prima facie* case. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (opining that degrading criticism or invidious comments about others can establish an inference of discrimination).

These comments are certainly relevant to her hostile work environment claim. But they are of little value for any disparate treatment claim because these were isolated statements and, more importantly, were not related in time or manner to any particular timely, discrete, job-related act that might support an actionable disparate treatment claim. *Cf. Cherry*, 564 F. Supp. 3d at 172 ("Verbal comments may give rise to an inference of discriminatory

motivation where a plaintiff alleges a nexus between the remarks and the alleged adverse actions.").

The plaintiff's burden at step one of the *McDonnell Douglas* framework is *de minimis*, but that does not mean it is somehow "non-existent." *Robles v. Cox & Co.*, 987 F. Supp. 2d 199, 206 (E.D.N.Y. 2013) (cleaned up). Plaintiff has not carried even this minimal threshold burden. Accordingly, defendant is entitled to summary judgment on any timely disparate-treatment claims.

### iv. <u>Legitimate Reasons</u>

For the reasons explained *supra*, plaintiff has utterly failed to establish a *prima facie* case of disparate-treatment discrimination as to any of the timely discrete acts identified in section II.B. Even so, in light of the very "minimal" and "*de minimis*" burden imposed at the first step in the *McDonnell Douglas* framework, the Court will analyze plaintiff's timely disparate treatment claims at steps two and three. After all, "[t]he purpose of this burden-shifting framework is to discourage dismissal of employment discrimination claims without an employer having to set forth a legitimate reason for the adverse action." *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019).

Once the plaintiff establishes a *prima facie* case, "the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions." *Cherry*, 564 F. Supp. 3d at 165. "The burden at this stage is also 'light,'" and the defendant need not persuade the court that it was motivated

by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." *Sotak*, 501 F. Supp. 3d at 78.

Upon review, defendant has carried his step-two burden of identifying a legitimate, non-discriminatory reason for any timely discrete acts on which a disparate-treatment claim might be based. *See* Def.'s Mem. at 25–29. First, in response to plaintiff's complaint about the lack of training opportunities, defendant asserts that Kelley was not responsible for leading this program.

Instead, defendant contends that the initial burden was on the trainee (in this case, plaintiff) to identify relevant training activities. Kelley's role was only to approve or disapprove the activity proposed by the trainee. Because plaintiff fails to argue that she identified any particular activities and instead just claims that she forwarded an e-mail complaint on this topic to Kelley and Lynch, defendant's explanation is more than sufficient to carry his burden of production at step two.

Second, in response to plaintiff's complaint about being reassigned the Cortland post office, defendant asserts that the overall workload of all three of the Grade 23 POOMs—plaintiff, Jeff Sands, and Tony Hall—increased as a result of the 2017 realignment. Kelley asserts that he reassigned Cortland to plaintiff because he sought to balance the workload of each Grade 23 POOM to "67 or 68 post offices."

As she does elsewhere, plaintiff responds that male POOMs were treated more favorably during this realignment.  But she does not go on to articulate how.  Instead, plaintiff just claims she should have been given the Endicott post office, which did not have any of Cortland's problems.  Because plaintiff has failed to offer any argument about how the reassignment of this single office was carried out unfairly when compared to the post offices assigned to male POOMs, defendant's workload-balancing explanation is again sufficient to carry his burden of production at step two.

**v.  <u>Pretext</u>**

The final step under *McDonnell Douglas* is about pretext.  Where, as here, the defendant has produced a legitimate, non-discriminatory reason for the challenged action, then "the presumption raised by the prima facie case is rebutted and drops from the case."  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (citation omitted).

"At the final stage, the plaintiff then has 'the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision'—a burden that 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'"  *Bucalo*, 691 F.3d at 1209 (quoting *Burdine*, 450 U.S. at 256).

"[I]n order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce more than simply

some evidence; it must be enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination." *Musante*, 270 F. Supp. 3d at 578 (cleaned up).

Upon review, even viewed in the light most favorable to her, plaintiff has not marshaled evidence from which a rational factfinder could conclude that she was the victim of intentional sex discrimination on any possible disparate treatment claim. *See, e.g.*, *Burdine*, 450 U.S. 248, 253 (1981) (distinguishing between burdens imposed by *McDonnell Douglas* and the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated").

This conclusion holds true even accounting for the loosened causation standard applicable to this category of discrimination claims. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act.").

As defendant correctly argues in reply, "[n]owhere in her memorandum of law does [plaintiff] present developed argument as to exactly how the reasons articulated by Defendant are pretextual." Def.'s Reply at 15.  To the extent that plaintiff suggests this evidence might be located elsewhere in her filings, the Court agrees with defendant: the memorandum of law should include the supporting or explanatory arguments that tie the facts to the law.

Instead, plaintiff's brief recites the general legal standards for her claims and then invites the Court to look at the statements of material fact to figure out how the two might line up with each other. *Cf. United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument it the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

But even putting that briefing issue aside, a review of plaintiff's other filings confirms that they still come up far short of establishing a genuine issue of fact for trial. Plaintiff repeatedly argues in general or conclusory terms that male POOMs were treated more favorably than her during the 2015 and 2017 realignments. But again, she usually does not go on to articulate how these comparators were treated meaningfully better in connection with a particular event or occurrence about which she complains.

To be sure, there are a few exceptions. For instance, plaintiff's complaint about the "forced" relocation to the Fort Plain office might qualify as a claim based on a discrete act. No other male POOMs were forced to relocate as a result of the realignment. And plaintiff avers that the Fort Plain office was unsafe and required a much longer commute. But even assuming this claim was a "continuing violation," it would have ended when plaintiff relocated back to the POOM area that included Utica in the spring of 2016. In either case, this Title VII claim was not exhausted and therefore it is time-barred.

Likewise, as she mentions elsewhere, plaintiff points to a decline in her own "NPA" performance scores as a result of the two realignments, especially the 2015 one.  Pl.'s Facts ¶ 210.  Plaintiff says these NPA scores can impact a POOM's salary or bonus.  Proof that plaintiff took a financial hit, or that one or more of her male colleagues got a financial bump, might present a viable claim for disparate treatment.  In fact, even in the absence of any "economic harm," plaintiff might have been able to articulate how she ended up with a "disproportionately heavy workload."  Again, though, any claim based on the 2015 realignment is time-barred.  And the only workload disparity arising from the realignment in 2017 was the addition of the Cortland office.  Even assuming that reassignment of this single office was sufficiently "material" to trigger further analysis, there is no supporting detail around that particular event that might permit a rational fact-finder to conclude that it was an adverse act motivated by Kelley's sex-based discriminatory animus.

If that kind of evidence is lurking in this fact record, plaintiff has not actually pointed it out for the Court.  Instead, plaintiff continues to speak about sex-based disparities in general terms.  For instance, plaintiff claims that the "average" promotional increase given to male employees (12.2%) was larger than the average increase given to women (10.5%).  Pl.'s Facts ¶ 246 (citing Ex. 35 to Krul Aff., Dkt. No. 103-35).  True or not, it would add little to the analysis of plaintiff's disparate treatment claims.  Nowhere does plaintiff

say how much she herself gained (or lost) in connection with any individual promotion or other event.  And the exhibit cited by plaintiff in support of this generalized assertion includes a chart that shows some women (*e.g.*, Nadine Tremblay) also received a large pay increase, too.

A disparate-treatment plaintiff must do more than claim that "something bad happened at work; I am (fill in the blank with one or more protected categories; therefore it must have happened because I am (fill in the blank with the applicable protected category/ies)." *House v. Wackenhut Servs., Inc.*, 2012 WL 4017334, at *1 (S.D.N.Y. Aug. 20, 2012).  As mentioned throughout this section, plaintiff repeatedly frames her assertions of disparate treatment in generalized, conclusory terms that boil down to speculation about Kelley's bad intent.

Defendant's reply accurately summarizes the reasons why plaintiff has failed to establish a jury question as to any of her possible disparate treatment claims.  Def.'s Reply. at 15–20.  In short, as defendant argues, plaintiff's disparate treatment claims are "nothing more than a laundry list of perceived slights differences of opinion as to managerial decisions, and personality conflicts." *Id*. at 19.  Because no reasonable fact-finder could hear

plaintiff's evidence and return a verdict in her favor, defendant is entitled to summary judgment on plaintiff's Title VII claims for disparate treatment.[15]

**b. <u>Hostile Work Environment</u>**

Second, plaintiff complains that defendant subjected her to a hostile work environment based on her sex, which is actionable if the plaintiff shows that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)).

Defendant argues that he is entitled to summary judgment on this hostile work environment claim because plaintiff has only identified "trivial harms," which are not actionable even if considered together. Def.'s Mem. at 30. As defendant explains, plaintiff's claim is based on various instances in which Kelley was "rude or unpleasant" or times where plaintiff was "offended" by his conduct or statements. *Id.* at 31. In defendant's view, "[t]he record lacks any evidence whatsoever that there was any impact on [plaintiff's] ability to

---

[15] Although this analysis focused on the pretext question teed up by *McDonnell Douglas*, the alternative "convincing mosaic" framework does not save these claims for trial, either. *See, e.g., Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("To meet his or her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more.").

do her job." *Id.* at 30.  According to defendant, no reasonable factfinder could side with plaintiff on this hostile work environment claim.  *See id.*

Plaintiff responds that defendant's "attempt to minimize many of the hostile acts against [p]laintiff as mere 'stray remarks' is unavailing."  Pl.'s Opp'n at 27.  Plaintiff claims that she has identified "numerous incidents of discriminatory harassment that she complained about, but were not addressed."  *Id.*  Plaintiff also argues that "Ms. Lynch, with the assistance of her subordinates in the HR department, made disparaging remarks and deliberate 'mistakes' that impaired [p]laintiff's ability to perform vital job functions, such as appointing [p]ostmasters and issuing pay raises."  *Id.*

Defendant replies that plaintiff "has failed to meet her burden to establish that any of the conduct that allegedly created the hostile work environment was because of her gender or EEO activity."  Def.'s Reply at 20.  According to defendant, none of the actions or comments about which plaintiff complains, whether considered individually or in the aggregate, rise to the level of a hostile work environment.  *See id.*

"Claims alleging a hostile work environment require a different analysis than discrimination or retaliation claims."  *Banks*, 81 F.4th at 259.  Unlike claims based on discrete acts, "incidents that give rise to a hostile work environment 'occur[ ] over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own.'"  *Id.* (quoting *Morgan*,

536 U.S. at 115).  Accordingly, "[t]he alleged conduct in many hostile work environment cases must be repeated or ongoing before it is adequately severe or pervasive to constitute a violation." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015).

To establish a hostile work environment claim, the plaintiff must show that "either a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment.'" *Alfano v. Costello*, 294 F.3d 365, 372 (2d Cir. 2002) (quoting *Cruz*, 202 F.3d at 570).  In either case, a plaintiff must also show that "the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).[16]

"In a claim of a hostile work environment, the emphasis is on the hostility of the work environment as a whole, not the motivation of one decisionmaker, and liability is 'determined only by looking at all the circumstances.'" *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 389 (2d Cir. 2020) (quoting *Harris*, 510 U.S. at 23).  For instance, "[e]vidence of a general work atmosphere . . . —as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Banks*, 81 F.4th at 262 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

---

[16] A plaintiff seeking relief for "sexual harassment" can also proceed under a *quid pro quo* theory.  *See, e.g.*, *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994).  That body of law does not fit plaintiff's facts.  And she does not urge that analysis in her brief.  Any such claim would fail.

Indeed, "incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination—for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." *Alfano*, 294 F.3d at 375.  Likewise, "conduct not directly targeted at or spoken to an individual but purposefully taking place in [her] presence can nevertheless transform [her] work environment into a hostile or abusive one." *Banks*, 81 F.4th at 262 (quoting *Rasmy*, 952 F.3d at 389).

"This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).

Upon review, plaintiff is clearly able to satisfy the *subjective* component of this claim.  If plaintiff testifies consistent with her affirmation, she would no doubt be able to establish that she subjectively perceived the environment to be permeated with abuse and sex-based discrimination that caused her to suffer significant, ongoing mental distress.  *See, e.g.*, *Banks*, 81 F.4th at 268 (emphasizing intangible psychological harm is actionable).  But even viewed in the light most favorable to her, no reasonable factfinder could hear

plaintiff's version of the evidence that has been marshaled in discovery and conclude that she has satisfied the *objective* component of this claim.

The objective component depends on the "totality of the circumstances," which includes: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris*, 510 U.S. at 23.

As an initial matter, the events that occurred before July 23, 2016 must be factored into this analysis. Although these actions were time-barred when considered as individual claims, they are still part of the "totality of the circumstances" of plaintiff's working environment. *Cf. McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) ("Under *Morgan*, a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related."); *see also Hampton v. Wilkie*, 554 F. Supp. 3d 512, 521 (E.D.N.Y. 2021) ("Hostile work environment claims fall under the 'continuing violation' exception to the timeliness requirement.").

But consideration of this broader set of facts does not alter the bottom-line conclusion: plaintiff cannot establish a triable issue of fact on the objective component of this claim. First off, when stripped of the conjecture and legal conclusions, nearly all of the incidents actually identified by plaintiff are

facially sex-neutral events that amount to nothing more than the ordinary incidents of workplace supervision or run-of-the-mill workplace conflicts.

This includes the fact that plaintiff was not invited to the Death Wish coffee recognition event, the fact that Kelley sat near plaintiff at the Oneida Golf Course work event (prompting an unidentified attendee to ask whether Kelley was "babysitting" her), and plaintiff's claim that Lynch and co-workers became "uneasy" around her after she filed her first EEO complaint. This includes the paperwork processing mistakes made by named and unnamed HR personnel and, absent more detail, the fact that Kelley delayed certain award requests or refused to permit plaintiff to communicate with him or HR Manager Lynch *solely* by e-mail.

This includes things such as the fact that Kelley, as plaintiff's supervisor, asked for "more information" or "justification" from plaintiff about her hiring decision, Kelley's decision to appoint Simmons as the Jamesville postmaster over plaintiff's objection, or even the fact that Kelley "slammed the phone" down when plaintiff objected to Simmons's placement.

This includes Kelley's criticism of plaintiff's disciplinary decisions during two staff meetings, the one-off imposition of "unfair" project deadlines and, absent more detail, the isolated denial of LSS "refresher" training. This also includes the fact that, at some point during 2015, Kelley awarded Clark a SPOT award instead of plaintiff. This includes the fact that in 2016, Kelley

denied plaintiff's request to have an unnamed postmaster returned from a "detail" in Albany and failed to respond to plaintiff's e-mail about training.

The same conclusion holds true for the POOM territory realignments in 2015 and 2017.  For instance, when plaintiff complained about being assigned more total post offices than her counterparts in the 2015 realignment, Kelley responded by promptly reassigning offices to other *female* POOMs.  And as for the 2017 realignment, the only detail plaintiff offers is her assertion that Kelley should not have assigned her the single Cortland office (which had serious problems and was out of her POOM area).

In sum, all of these various occurrences are either facially sex-neutral incidents or trivial workplace harms, and in almost all cases they are both facially neutral *and* completely trivial.

Plaintiff's strongest single piece of evidence is perhaps her assertion that Kelley forced her to relocate to the Fort Plain post office in the wake of the 2015 realignment.  The parties agree that other POOMs were not required to relocate as part of this realignment.  The parties also agree that the Fort Plain office was in a state of serious (and possibly even dangerous) disrepair. It also required plaintiff to undertake a much longer commute until she was reassigned back to Utica.  But even if this episode could somehow be viewed as *sex-motivated*, it is categorically insufficiently severe or pervasive to create

an abusive working environment, even when considered as part of the overall course of incidents that plaintiff experienced.

The isolated incidents of possibly harassing or sex-motivated comments identified by plaintiff in her affirmation do not change this result. As noted *supra*, the repetitive or ongoing nature of the misconduct that typically gives rise to a hostile work environment claim makes this a highly "fact-specific" area of law. *McGullam*, 609 F.3d at 77. So courts must be careful not to set the bar to relief too high. *Terry*, 336 F.3d at 148. "The environment need not be 'unendurable' or 'intolerable.'" *Id.* (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000). Instead, the "test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" *Id.*

As relevant here, the plaintiff "need not recount each and every instance of abuse" or present a list of specific acts in order to create a triable issue of fact on a hostile work environment claim. *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 120 (2d Cir. 2010). Instead, in some cases a plaintiff's testimony about "general allegations of constant abuse" suffice to establish a triable question of fact. *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997).

But a review of the kind of hostile work environment claims that survive summary judgment and actually warrant a trial only confirms that plaintiff's evidentiary showing is woefully insufficient. Start with *Torres*, the case just

cited for the proposition that generalized testimony of "constant abuse" can sometimes suffice to establish a hostile work environment claim for trial.

In *Torres*, the Second Circuit examined a hostile work environment claim that relied on testimony by the plaintiff that her supervisor "constantly harassed her—so often that she 'lost count'—but that she could recall the exact dates and circumstances of only a few incidents of harassment." 116 F.3d at 631. Although the plaintiff's claim failed for other reasons, the panel observed that "[i]f a jury were to credit [the plaintiff's] general allegations of constant abuse, which were confirmed by her coworkers, it could reasonably find pervasive harassment, even in the absence of specific details about each incident." *Id*.

Importantly, though, the alleged conduct in *Torres* was patently offensive and sexually charged. Without repeating all of the alleged misconduct, the plaintiff claimed that her supervisor: "1) habitually referred to [her] as a 'dumb cunt' or 'dumb spic' in the office; 2) made insulting remarks about the size of [her] breasts and buttocks; (3) made sexual innuendos towards [her]; [and] 4) crudely indicated to other employees his desire to have sex with [her]." *Torres*, 116 F.3d at 628.

A few years later, in *Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir. 2000), the Second Circuit remanded for trial the plaintiff-firefighter's hostile work environment claim based on a single incident of extremely severe verbal

harassment that occurred "at length" in front of subordinates and was followed up by efforts to undermine the plaintiff's leadership. But just like *Torres*, the improper statements challenged in *Howley* were patently sexually offensive and facially hostile. *Id.* at 148.

A more recent case might be something like *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537 (2d Cir. 2010), where the Second Circuit remanded for trial a hostile work environment claim that was based on a mix of sex-neutral and overtly sexual comments by a supervisor that included some physical threats against the plaintiff and others.

Another example might be *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112 (2d Cir. 2010), where the Second Circuit remanded for a trial based on the plaintiff's testimony, which was corroborated by her coworkers, that she experienced ongoing mistreatment that included unsafe assignments, the unfair provision of work, and verbal abuse and reprimands for behavior that was considered commonplace amongst her male coworkers.

A more recent example would be *Banks v. General Motors, LLC*, 81 F.4th 242 (2d Cir. 2023), where the panel remanded for trial the plaintiff's hostile work environment claim that was supported by "extensive and detailed examples of pervasive and long-term sex- and race-based animosity" that included, among other things, multiple incidents of "sexually demeaning

language" directed at plaintiff and other females as well as a setting "where images of pin-up women and sexually explicit silhouettes were common." *Id*.

Even viewed in the light most favorable to her, and even drawing all reasonable inferences in her favor, the series of events described by plaintiff are simply nothing like the fact patterns found in *Torres*, *Howley*, *Pucino*, *Kaytor*, or *Banks* or, for that matter, the fact patterns of any other hostile work environment claims in this Circuit that have warranted a trial.

Importantly, one of the only times plaintiff even offers any account of any alleged sex-based "harassment" is from June 2016, when plaintiff asserts that Kelley "mocked" her in the presence of two male co-workers "using a female high-pitched whiny tone." But this single assertion, even paired with her more generalized accusation that Kelley *always* "mimicked, mocked, taunted, and laughed at [her]," is not enough to generate a triable issue of fact on the objective component of this claim.

To be clear, the Court recognizes that prior fact patterns in hostile work environment cases do not set some bar that must be cleared. Indeed, the Second Circuit has explicitly held that "[p]rior cases in which [a panel has] concluded that a reasonable juror could find that the work environment was objectively hostile do not 'establish a baseline' that subsequent plaintiffs must reach in order to prevail." *Schiano v. Quality Payroll Sys., Inc.*, 445

F.3d 597, 606 (2d Cir. 2006) (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 439 (2d Cir. 1999)).

The Court also recognizes that this "severe or pervasive" standard creates a disjunctive test, which can be satisfied with evidence that creates an issue of fact about severity, pervasiveness, or even a mix of both. *Pucino*, 618 F.3d at 119 ("In establishing this element, a plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions.").

But "[z]ero plus zero is zero," *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011), and that basic equation holds true no matter how many zeroes you try to add. Simply put, plaintiff's assertions of misconduct (almost all of which are facially sex-neutral events of clearly trivial magnitude) would be insufficient to permit a rational factfinder to conclude that her working environment ever became *objectively* hostile. Accordingly, defendant is entitled to summary judgment on this claim.

### c. **Constructive Discharge**

Third, plaintiff complains that she was forced to retire as soon as she was eligible to do so because she could no longer tolerate the working conditions she experienced under Kelley's supervision. In other words, plaintiff has alleged that she suffered a "constructive discharge," which can be actionable

as a species of "disparate treatment." *See, e.g.*, *Walsh v. Scarsdale Union Free Sch. Dist.*, 375 F. Supp. 3d 467, 478 (S.D.N.Y. 2019).

Defendant argues that he is entitled to summary judgment on this claim because plaintiff did not retire until nearly a year after the last hostile or discriminatory act occurred. Def.'s Mem. at 34. As defendant explains, courts in this Circuit generally conclude that a plaintiff has not established a claim for "constructive discharge" unless the evidence shows that they left their job within a "reasonable time" after the bad acts occurred. *Id.*

Plaintiff responds that she retired "pursuant to the recommendation of her treating healthcare provider, who advised she needed to retire as soon as she was eligible to do so." Pl.'s Opp'n at 31. According to plaintiff, she did so "as a result of the discriminatory and retaliatory acts she experienced working for [USPS]." *Id.* As plaintiff explains, she "experienced a continuing campaign of harassment and discrimination," including repeatedly being "treated less favorably than her male counterparts" and facing "concerted efforts" by Kelley and Lynch "to diminish her reputation and respect among her subordinates." *Id.*

Defendant replies by reiterating that plaintiff waited "almost a full year after the final allegedly hostile act occurred" before finally retiring. Def.'s Reply at 22. According to defendant, "the record lacks evidence of conditions so intolerable that a reasonable person would be forced to resign." *Id.*

"Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 299 (S.D.N.Y. 2009). "Working conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Walsh*, 375 F. Supp. 3d at 478.

Upon review, defendant is entitled to summary judgment on plaintiff's constructive discharge claim. "Several Circuits have held that if a plaintiff does not leave his or her position within a reasonable time after last being the subject of discrimination, he or she cannot prevail under a constructive discharge theory." *Williams v. Timberlodge Steak House*, 2005 WL 189726, at *10 (W.D.N.Y. Jan. 16, 2005) (collecting cases).

Even viewed in the light most favorable to her, the record establishes that the last "hostile" or "discriminatory" act identified by plaintiff occurred in November of 2017. Although she continued her mental health treatment into and after this period, plaintiff did not retire until September of 2018, almost ten months later.

This temporal gap defeats plaintiff's claim. Constructive discharge is a theory of relief reserved for those instances in which a plaintiff's working conditions have become so intolerable that (1) the plaintiff feels forced to

resign; and (2) a reasonable person in the plaintiff's shoes would *also* have felt forced to resign.  It does not reach cases in which the plaintiff experiences working conditions at one point that lead her, either reasonably or otherwise, to choose to retire at some later point in time.  That is especially true when the allegedly intolerable nature of the working conditions has not occurred for many months.  Accordingly, defendant is entitled to summary judgment on plaintiff's constructive discharge claim.

### 2.  <u>Count Two – Retaliation</u>

Fourth and finally, plaintiff claims she was subjected to "multiple adverse actions" after she complained about Kelley's mistreatment.  In other words, plaintiff has alleged retaliation in response to her protected activity, which can be actionable if the defendant had a retaliatory intent when taking the adverse action at issue.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

At the outset, it is worth taking a moment to point out that it remains an open question whether Title VII's prohibition on retaliation extends to protect federal employees.  *Green*, 578 U.S. at 551 n.1.  Unlike the private-sector provisions of the statute, which set out a specific list of unlawful employment practices, § 2000e-2, and contain a provision forbidding retaliation, § 2000e-3, the federal-sector language of Title VII simply "contains a broad prohibition of 'discrimination.'"  *Gomez-Perez v. Potter*, 553 U.S. 474, 487 (2008).

"Nevertheless, given the 1972 amendment's ostensible goal—extending Title VII's protections to federal employees—federal courts have routinely assumed that Title VII prohibits the federal government from retaliating against its employees for engaging in protected activities." *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022). Indeed, "[i]t is common in these cases for the federal government, as the defendant-employer, to concede that Title VII prohibits retaliation." *Id*. Defendant appears to have done so in this case.

Title VII prohibits retaliation against an employee who makes or supports a charge of discrimination. 42 U.S.C. § 2000e-3(a). This provision protects the anti-discrimination component of the statute "by preventing an employer form interfering (through retaliation) with an employee's effort to secure or advance enforcement of [Title VII's] basic guarantees." *White*, 548 U.S. at 63.

As with the statute's substantive anti-discrimination provision, a plaintiff can prove the employer's retaliatory animus with direct evidence. *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003); *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). But as with evidence of discriminatory intent or motive, direct evidence of retaliatory animus is hard to find. *See, e.g., Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992). After all, "[d]irect evidence is essentially an outright admission that a challenged action was undertaken for one of the forbidden reasons covered in Title VII." *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005).

So Title VII retaliation claims also tend to rely on the aggregated weight of circumstantial evidence.  *See, e.g.*, *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010).  This usually involves evidence that the protected activity was followed closely by discriminatory treatment or with a showing that other employees who engaged in similar conduct were treated differently.  *Raniola*, 243 F.3d at 625.

At summary judgment, the sufficiency of a retaliation claim is analyzed with the same *McDonnell Douglas* three-step burden-shifting framework that applies to intentional discrimination claims based on indirect proof.  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

The initial burden is on the plaintiff to establish a *prima facie* case of retaliation by showing: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Hicks*, 593 f.3d at 164 (quoting *Jute*, 420 F.3d at 173)).  As before, the burden of proof at this stage is "*de minimis* . . . but it is not non-existent."  *Ringel v. N.Y. City Dep't of Educ.*, 616 F. Supp. 3d 205, 233 (E.D.N.Y. 2022) (citation omitted).

"If a plaintiff sustains the initial burden, a presumption of retaliation arises."  *Jute*, 420 F.3d at 173.  The burden then shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment

action." *Id*. After an employer offers up evidence of a legitimate, permissible reason for its action, "the presumption of retaliation dissipates." *Id*.

At that point, the burden is back on the plaintiff to show that retaliation was a "but-for" cause of the adverse action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). Notably, there can be more than one "but-for" cause of an adverse action. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020). But unlike disparate treatment claims, showing that retaliatory intent was a "substantial" or "motivating" factor in the employer's decision is ordinarily not enough.[17] *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

### a.  Exhaustion & Protected Activity

As an initial matter, the parties are not on the same page about plaintiff's "participation in a protected activity." Defendant, for his part, concedes that plaintiff's October 2016 EEO complaint qualifies as protected activity. Def.'s Mem. at 32. But plaintiff contends that her "internal complaints" are also protected activity. Pl.'s Opp'n at 28.

"Protected activity is a formal or informal complaint about employment practices or conditions that is motivated by a good faith, reasonable belief that the underlying employment practice was unlawful, even if the practices

---

[17] The Seventh Circuit has held that the federal-sector provision incorporates a lessened causation standard. *Huff*, 42 F.4th at 646. That will be discussed briefly *infra*.

or conditions were not actually unlawful." *Ringel*, 616 F. Supp. 3d at 233 (cleaned up).  The only real limitation on what can qualify as "protected activity" is that the employee's complaint "cannot be so vague or generalized that the employer could not reasonably have understood that the plaintiff's complaint was directed at conduct prohibited by Title VII." *Bowens-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) (cleaned up).

Measured against this employee-friendly standard, plaintiff is correct that her informal or internal complaints might also constitute "protected activity," at least for purposes of summary judgment.  But this is where the analytical trouble with plaintiff's retaliation claim begins.  Here is plaintiff's entire legal argument on the protected activity question:

> Defendant acknowledges that Plaintiff's October 2016 EEO complaint constituted protected activity. Plaintiff's internal complaints of discrimination and retaliation are also protected.

Pl.'s Opp'n at 28.

Which ones?  As just explained *supra*, it is true that informal or internal complaints to supervisors, such as Kelly, or even to other relevant staff, such as Lynch, can qualify as "protected activity."  Contact with an EEO counselor could also qualify as "protected activity."  But even the most cursory review of the factual narrative recited in section II.B shows that plaintiff internally "complained"—sometimes directly to Kelly and other times to Lynch or even

her co-workers—about a whole slew of different events that, in plaintiff's mind, amounted to unfair, sex-motivated mistreatment.

The problem is that plaintiff's opposition brief does not bother to articulate how a single one of these informal or internal complaints were even arguably sufficiently specific so as to put the employer on notice that she was engaged in "protected activity." *See Bowens-Hooks*, 13 F. Supp. 3d at 222. Worse still, plaintiff does not attempt to connect any particular instance of this "protected activity" to any particular action taken against her. *See* Pl.'s Opp'n at 28–30.

Importantly, however, there is an independent legal basis on which to conclude that most of these informal complaints need not be considered: the exhaustion requirement. Although this is an affirmative defense, *Belgrave v. Pena*, 253 F.3d 384, 386 (2d Cir. 2001), it was raised by defendant in support of this part of his motion, *see* Def.'s Mem. at 32 (incorporating "all the reasons discussed above as to [plaintiff's] discrimination claims"), and plaintiff's brief has nothing to say about it in response, *see* Pl.'s Opp'n at 27–31. Accordingly, any informal or internal complaints that occurred before plaintiff initiated her first EEO contact (which explicitly mentions possible retaliation) must be dismissed as unexhausted.[18]

---

[18] Defendant tacitly concedes that all this post-complaint conduct might be considered to be "reasonably related" to her EEO contact. *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002).

## b. **Adverse Action**

This threshold conclusion about timeliness leads to a second problem with plaintiff's retaliation claim.  Title VII's anti-retaliation provision imposes an "adverse action" requirement.  *Krul*, 501 F. Supp. 3d at 99.  This is a baseline requirement intended to screen out "[a]ctions that are trivial harms—*i.e.*, those petty slights or minor annoyances that often take place at work and that all employees experience."  *Tepperwien*, 663 F.3d at 568 (2d Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)).

Importantly, however, this "materiality" requirement sweeps in a much broader range of alleged conduct than the "job-related" one that applied to her disparate treatment claims.  *White*, 548 U.S. at 69 ("The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.").  As the Supreme Court has explained:

> Context matters.  The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.  A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*White*, 548 U.S. at 69 (cleaned up).

Thus, "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien*, 663 F.3d at 568 (citing *Hicks*, 593 F.3d at 165).  Importantly, "[a] plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful 'so long as [s]he can establish that [s]he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia*, 313 F.3d at 719 (quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)).

Even so, this relaxed version of the materiality requirement is not entirely toothless.  Instead, "[m]aterial adversity is to be determined objectively, based on the reactions of a reasonable employee." *Tepperwien*, 663 F.3d at 568.  In other words, "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Banks*, 81 F.4th at 275 (quoting *White*, 548 U.S. at 68).

Measured against this general body of law, and even viewed in the light most favorable to plaintiff, it is again immediately obvious that the events about which plaintiff complains are completely non-actionable as retaliation

claims because they are objectively trivial things that are incapable of

dissuading a reasonable worker from engaging in protected activity:

- The fact that plaintiff doled out some of her own SPOT award money to her former supervisees after Tony Hall failed to respond to her requests for information.

- The fact that Kelley denied a SPOT award to a non-party employee on a single occasion.

- The fact that Kelley complained about plaintiff to the IG, who took no action.

- The fact that plaintiff was excluded from the coffee recognition event.

- The fact that Kelley sat near plaintiff at the Oneida Golf Course event.

- The fact that Kelley gave plaintiff a SPOT award.

- The fact that Kelley denied plaintiff's request for an unnamed postmaster to be returned from a "detail" in Albany.

- The fact that HR Manager Lynch and others became "uneasy" around plaintiff and began to "avoid" her after she filed her EEO complaint.

- The fact that HR employees made four mistakes.

- Absent more, the fact that Kelley granted certain award requests by male colleagues more quickly than the ones she submitted to him.

- The fact that Kelley and HR Manager Lynch refused to permit plaintiff to communicate with them *solely* by e-mail.

- The fact that unnamed people in the HR department "held up" certain vacancy postings after plaintiff complained to Theresa Bruso.

Notably, as explained *supra*, plaintiff's opposition brief does not identify whether she believes that some or all of her specific complaints qualify as "protected activity." For instance, plaintiff's initial EEO-contact documents indicate the possibility of "retaliation" because "management [was] told they were violating her rights." Ex. SS to Stack Decl.

Of course, a review of the record confirms that, at the very least, plaintiff's two formal EEO filings absolutely qualify as "protected activity." But absent more of an explanation from plaintiff, it is hard to tie any other conduct that might qualify as "protected activity" to one or more possible "adverse actions."

As noted elsewhere in this opinion, these failures are problematic. How is the Court supposed to analyze whether one or more of these events might be sufficient to sustain a retaliation claim without meaningful guidance from the party who will bear the ultimate burden of proof at trial?

In any event, even accounting for the broader range of "adverse action" swept in by this version of the "materiality" requirement, none of these acts bear any of the indicia of a qualifying adverse action. This includes Kelley's failure to respond to plaintiff's e-mail complaint about a lost IDP opportunity

as well as the fact that Kelley reassigned the Cortland office to plaintiff as part of the second realignment in 2017.

Importantly, even viewed in the aggregate, no objectively reasonable employee in plaintiff's shoes might have been dissuaded from engaging in protected activities based on this course of events.  *Carr v. N.Y. City Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023) (explaining that claim of "retaliatory hostile work environment" is like "a claim that an employer took multiple retaliatory actions that were, in the aggregate, 'materially adverse.'").

That conclusion should be enough to end this legal analysis.  But, as with other applications of the *McDonnell Douglas* framework, "[t]he plaintiff's burden at the beginning of the case is a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement.  *Raniola*, 243 F.3d at 624.  Accordingly, the Court will proceed to steps two and three.

### c. **Legitimate Reasons & Pretext**

"If a plaintiff sustains the initial burden, a presumption of retaliation arises."  *Jute*, 420 F.3d at 173.  The burden then shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.*  After an employer offers up evidence of a legitimate, permissible reason for its action, "the presumption of retaliation dissipates."  *Id.*

For reasons discussed *supra*, defendant has carried his step-two burden of production as to these (and other) actions. *See* Def.'s Reply at 15–20. Thus, the burden is back on plaintiff to identify evidence from which a reasonable fact-finder could conclude that there was a causal relationship between any instance of "protected activity" and any (still basically unidentified) instance of adverse action in the broader sense.

Upon review, whether this causal relationship should be correctly framed as a "but-for" standard, *Nassar*, 570 U.S. at 352, or whether an even more plaintiff-friendly standard borrowed from other federal-sector discrimination statutes should apply, *Huff*, 42 F.4th at 646, a review of the discovery record confirms that plaintiff cannot carry this step-three burden.

In reaching this conclusion, the Court recognizes that temporal proximity plays an important role in establishing indirect evidence of discriminatory or retaliatory animus. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.").

But temporal proximity alone cannot bear *all* of the weight in getting a circumstantial claim for retaliation over to trial. *See, e.g.*, *Zann Kwan*, 737 F.3d at 848. As defendant correctly argues in reply:

> Krul can offer no *evidence* that such actions were mere
> pretexts for retaliation, instead pointing only to her
> conclusory, subjective views that she suffered
> retaliation. Despite Krul's account that—at most—
> details a plethora of personality conflicts and
> disagreements and petty slights, she does not
> "describe a situation, even when viewed in the
> aggregate, that would deter a reasonable employee
> from engaging in protected activities."

Def.'s Reply at 21–22 (quoting *Chiang v. Donahoe*, 579 F. App'x 39, 42 (2d

Cir. 2014) (summary order)). Accordingly, defendant is entitled to summary

judgment on plaintiff's retaliation claim.

## V. <u>CONCLUSION</u>

The Second Circuit has "repeatedly expressed the need for caution" when

it comes to motions for summary judgment in the employment discrimination

context. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). This kind of

case often turns on the force of circumstantial proof. And that often involves

disputes about a decision-maker's motive, intent, or state of mind.

But that does not mean summary judgment in these cases must always be

denied. To the contrary, the Supreme Court has repeatedly instructed lower

courts not to "treat discrimination differently from other ultimate questions

of fact." *Reeves*, 530 U.S. at 148 (citation omitted). After all, "[t]he summary

judgment rule would be rendered sterile . . . if the mere incantation of intent

or state of mind would operate as a talisman to defeat an otherwise valid

motion." *Meiri v. Dacon*, 795 F.2d 989, 998 (2d Cir. 1985).

Sometimes it is tough to thread this needle.  But this is not one of those cases that boil down to a genuine dispute over a decision-maker's intent in taking a challenged action.  Plaintiff no doubt subjectively perceived Kelley (and others) to be unfair and abusive toward her.  And it is almost certainly true that she believed her work environment became too hostile to tolerate.

But Title VII's workplace protections do not rely *solely* on the employee's subjective interpretation of her working conditions.  Instead, discrimination and retaliation claims still incorporate some form of objective standard used to weed out non-actionable workplace grievances.

To the extent that plaintiff's briefing offered any guidance about what she actually believed the actionable "adverse actions" taken against her to be, a straightforward application of the legal principles governing materiality in each context (*i.e.*, discrimination and retaliation) confirmed that her claims were untimely or non-actionable or both.

To the extent that one or more of these adverse actions, viewed in the light most favorable to her, warranted further scrutiny under either version of the *McDonnell Douglas* framework (*i.e.*, discrimination or retaliation), a careful analysis confirmed that plaintiff has not marshaled sufficient proof to generate a triable issue of fact on either kind of Title VII claim.

Therefore, it is

ORDERED that

1.  Defendant's motion for summary judgment is GRANTED; and

2.  Plaintiff's second amended complaint is DISMISSED.

The Clerk of the Court is directed terminate the pending motion, enter a

judgment accordingly, and close the file.

IT IS SO ORDERED.


Dated:  December 6, 2023
        Utica, New York.

David N. Hurd
U.S. District Judge